JUDGE PAULEY



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DARREN FELIX,

                                Plaintiff,

      - against -

THE CITY OF NEW YORK and JOSE
MORALES,

                           Defendants.
-------------------------------------------------------------------x

**NOTICE OF REMOVAL**

Docket
CV

ECF Case

Bronx County
Index No.: 302795/13

RECEIVED
MAY - 7 2013
U.S.D.C. S.D. N.Y.
CASHIERS

        Defendant, THE CITY OF NEW YORK, ("the CITY"), by its attorney, MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, upon information and belief, respectively petitions this Court, pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1446(b) as follows:

       1.     On May 1, 2013, Plaintiff DARREN FELIX ("plaintiff") commenced the above-captioned civil action which is currently pending in the Supreme Court of the State of New York, Bronx County, under Index No. 302795/13, and of which a trial has not yet been had therein. A copy of the summons and Complaint is annexed hereto as Exhibit A.

       2.     On May 3, 2013, the CITY received personal service of a copy of the plaintiff's summons and complaint. See Exhibit A.

       3.     According to the complaint, in 2004, plaintiff was allegedly wrongfully convicted of attempted murder and imprisoned in connection with a shooting that occurred outside a McDonald's restaurant in the Bronx, New York. See ¶¶ 1-3 of Exhibit A.

       4.     In 2010, following its own re-investigation of the case, the Bronx County District Attorney's Office agreed to vacate the plaintiff's conviction on the grounds of newly-discovered evidence of plaintiff's actual innocence. See ¶ 71 of Exhibit A.

5.     The within action seeks monetary damages for injuries suffered by plaintiff due to the police and the trial prosecutor's alleged failure to disclose *Brady* evidence and information favoring the plaintiff, violating his rights to Due Process and a Fair Trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.  See ¶¶ 29-36, 56-58, 95-103 of Exhibit A.

6.     The complaint further seeks to hold liable the CITY pursuant to 42 U.S.C. § 1983, and Monell v. Dept. of Social Services, 436 U.S. 658 (1978), as a result of the Bronx County District Attorney's Office alleged unlawful policies, customs or practices, and/or deliberate indifference to the unlawful practices of their employees.  See ¶¶ 74-77, 92-93 of Exhibit A.

7.     Accordingly, this is a civil action over which the District Courts of the United States have original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441.

8.     This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

9.     Upon information and belief, co-defendant JOSE MORALES has not been served process with a copy of the pleadings at the time the removal petition is filed, and therefore his consent to this removal is not required under 28 U.S.C. § 1446.

10.     Attached to this Notice, and by reference made a part hereof, are true and correct copies of all known pleadings filed herein.

11.     By filing this Notice of Removal, the CITY does not waive any defense which may be available to it, specifically including, but not limited to, its right to contest in personam jurisdiction, improper service of process and the absence of venue in this Court or the Court from which this action has been removed.

**WHEREFORE**, the CITY respectfully requests that the instant action now pending before Supreme Court of the State of New York, Bronx County, be removed to the United States

District Court of the Southern District of New York, and for such other and further relief as this

Court deems proper and just.

Dated: New York, New York
      May 7, 2013

                        MICHAEL A. CARDOZO,
                        Corporation Counsel of the City of New York
                        Attorney for City of New York
                        100 Church Street
                        New York, NY 10007
                        (212) 356-3140
                        ewest@law.nyc.gov

        By:

                      _____
                        ERIC H. WEST  (EW3000)
                        Special Assistant Corporation Counsel

TO:    LAW OFFICES OF JOEL B. RUDIN, ESQ.
       Attorney for the Plaintiff
       200 West 57th Street, Suite 900
       New York, New York 10019
       phone: 212-752-7600
       fax: 212-980-2968
       jbrudin@aol.com

FILED May 01 2013 Bronx County Clerk                                   Index Number: 302795-2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X

DARREN FELIX,                                    :

                    Plaintiff,          :   **SUMMONS**

           -against-               :   Index No. _____

THE CITY OF NEW YORK and JOSE          :
MORALES,
                                       **Jury Trial Demanded**

               Defendants.       :

-------------------------------------------------------------------X

To the above-named defendants:

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or if the complaint is not served with this summons, to serve a notice of
appearance, on the plaintiff's attorney within twenty (20) days after service of this summons,
exclusive of the day of service (or within thirty [30] days after service is complete if this
summons is not personally delivered to you within the State of New York). In the case of your
failure to appear or answer, judgment will be taken against you by default for the relief demanded
in the complaint.

     The basis of the venue designated is Bronx County because it is where the cause of action
arose and because of Plaintiff's designation.

Dated:     New York, New York
            May 1, 2013

                                          BY: JOEL B. RUDIN, ESQ.
                                          200 West 57th Street, Suite 900
                                          New York, New York 10019
                                          (212) 752-7600
                                          Email: jbrudin@aol.com

                                  *ATTORNEY FOR THE PLAINTIFF*

COUNTY CLERK
BRONX COUNTY
2013 MAY -1 PM 3:01
RECEIVED

FILED  May 01 2013 Bronx County Clerk

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------X

DARREN FELIX,                                        :

                        Plaintiff,                   :        **COMPLAINT**

                -against-                             :        Index No. _____

THE CITY OF NEW YORK and JOSE                        :
MORALES,
                                                              **Jury Trial Demanded**
                        Defendants.                  :

-----------------------------------------------------------------X

RECEIVED

2013 MAY -1  PM 3:0
COUNTY CLERK
BRONX COUNTY

Plaintiff DARREN FELIX ("Plaintiff"), by his attorneys, the LAW OFFICES OF JOEL

B. RUDIN, complaining of the Defendants, respectfully alleges, upon information and belief, as

follows:

## NATURE OF ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary

damages for Plaintiff, DARREN FELIX, due to his wrongful conviction and nearly seven-year

imprisonment, which was substantially caused by the misconduct of a New York City police

detective, Jose Morales, and the deliberate indifference of the Bronx County District Attorney to

a pattern of unconstitutional behavior by his subordinates.

2.      Plaintiff was convicted in 2004 of attempted murder in connection with a shooting

that occurred outside a McDonald's Restaurant in the Bronx.  The most important prosecution

witness saw the shooter, supposedly positively identified him as Plaintiff at a police-arranged

photo array, and then gave devastating testimony to that effect at Plaintiff's trial. Not until after

Plaintiff's conviction did he learn, through his Legal Aid attorney, that this witness in fact had

told Det. Morales that the person in the photo array merely "looked like" the shooter, and that he

then poisoned her objectivity by telling her that she had picked out the "correct" person whom

the police had arrested.  Not until after conviction did Plaintiff learn that, at the time of trial, this

witness told the prosecutor that the defendant on trial was *not* the shooter, but the prosecutor told

her she was mistaken, caused her to omit that disclosure from her testimony, and suppressed the

information from Plaintiff and his attorney.

3.      While the Bronx District Attorney ultimately agreed to vacate Plaintiff's

conviction based upon newly-discovered evidence that convinced it of Plaintiff's complete,

actual innocence, Plaintiff would *not* have been convicted at all but for the police and the trial

prosecutor's misconduct.  This lawsuit seeks to hold liable not just the police detective, but also

the defendant CITY OF NEW YORK ("Defendant CITY"), pursuant to *Monell v. Dept. of Social*

*Services*, 436 U.S. 658 (1978), because the deliberate indifference of the Bronx District Attorney,

as policymaker for the City, was a substantial cause of the prosecutor's misconduct which in turn

caused Plaintiff's constitutional injuries.

<u>**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**</u>

4.      This action arises under 42 U.S.C. §§ 1983 and 1988, and under the

common law of the State of New York.

5.      Venue is proper in this County because it is where the cause of action arose

and because of Plaintiff's designation.

6.      This action has been commenced within three years of the accrual of Plaintiff's

causes of action.

7.      Plaintiff has duly complied with all of the conditions precedent to the

2

FILED May 01 2013 Bronx County Clerk

commencement of this action.

## THE PARTIES

8.  Plaintiff, DARREN FELIX, is a citizen and resident of the State of New York.

9.  Defendant, the CITY OF NEW YORK ("Defendant CITY"), is a municipal corporation existing by virtue of the laws of the State of New York. The Bronx County District Attorney's Office is an agency of Defendant CITY, with its principal place of business in Bronx County, where the cause of action arose.

10.  Defendant JOSE MORALES ("Defendant Morales"), Tax I.D. No. 904620, was at all relevant times a detective employed by the New York City Police Department ("NYPD"), acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A.  **The Crime, The Initial Investigation, and Plaintiff's Arrest**

11.  On July 23, 2003, at approximately 10:00 p.m., Kantari Baragi was shot outside a McDonald's restaurant located at 86 East 167th Street in the Bronx, New York.

12.  Mr. Baragi was seriously wounded. He was rushed to the hospital.

13.  NYPD officers arrived at the scene shortly after the shooting, interviewed witnesses, and issued a "radio run" containing the description the witnesses had provided of a Black male perpetrator wearing a white t-shirt and blue jeans.

14.  Police saw Plaintiff on the street, one block from where the shooting occurred. Plaintiff happens to be a Black male, and at the time was wearing a white t-shirt and blue jeans.

15.  During single-person "show-up" procedures, one of the eyewitnesses, as well as

3

FILED May 01 2013 Bronx County Clerk

the victim, identified Plaintiff as the shooter. In each procedure, only Plaintiff, and no filler, was exhibited to the witness.

16.     Plaintiff gave a tape-recorded statement insisting on his innocence. Plaintiff stated that he knew who the true shooter was, a man from the neighborhood named "Justo."

17.     Plaintiff was arraigned on July 25, 2003, in the Criminal Court, Bronx County, and detained in lieu of bail.

18.     Approximately one week after Plaintiff's arrest, on July 30, 2003, a second eyewitness, Sara Torres, met with the police to answer questions about the shooting.

19.     Ms. Torres, who was 15 years old, had been working at the counter at the McDonald's on the night of the shooting, and had observed the shooter having an altercation with the eventual victim.

20.     Ms. Torres told the detectives that she knew the shooter as a regular customer. She said that the shooter came to the McDonald's at least once per week, that he usually ordered an iced tea, and that he occasionally would flirt with her. She said that she did not know his name.

21.     Ms. Torres was shown a photo array containing a photograph of Plaintiff, as well as five "fillers."

22.     This photo array procedure was conducted by Defendant MORALES.

23.     Ms. Torres was not shown a photograph of Justo.

24.     Upon viewing the photo array, Ms. Torres indicated that the photograph of Plaintiff "look[ed] like" the shooter.

4

FILED May 01 2013 Bronx County Clerk

25.     Detective MORALES, in response to Ms. Torres's tentative statement, asked her if she was "sure" that Plaintiff was the shooter, even though Ms. Torres had only stated that Plaintiff's photograph *resembled* the perpetrator.

26.     When Ms. Torres responded that she was "sure," Defendant MORALES then confirmed for Ms. Torres that she had selected the right person by telling her she had selected the individual who had been arrested for the shooting.

27.     Defendant MORALES knew that he was required by the NYPD to record in a written report the complete statement of an eyewitness viewing a photo array, and to disclose such statement to the District Attorney's Office.

28.     Defendant MORALES also knew that he was required by the NYPD to refrain from making any statement to an eyewitness, during or following a photo identification procedure, that might suggest to the eyewitness who to select or to reinforce the eyewitness's level of certainty about the person he or she had "identified."

29.     These obligations arise from the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, as well as *Brady v. Maryland*, 373 U.S. 83 (1963).

30.     Despite these obligations, Defendant MORALES recorded in a DD-5 form that Ms. Torres had made a "positive" identification of Plaintiff.

31.     Defendant MORALES did not reveal in this DD-5, or in any other written report or document, that Ms. Torres had initially stated that Plaintiff merely "looked like" the shooter, that she only said she was "sure" after being questioned by Defendant MORALES, and that

5

Defendant MORALES told Ms. Torres that her "identification" was correct.

32.    Defendant MORALES did not disclose any of the above to the Bronx District
Attorney's Office, or to Plaintiff, at all.

33.    Ms. Torres was not shown a live line up.

34.    Plaintiff was indicted by the Grand Jury in *People v. Felix*, Ind. No. 3449/03, on
August 8, 2003.

35.    Following Plaintiff's indictment, Plaintiff's counsel made a specific request of the
prosecution to disclose "any and all records and/or information which arguabl[y] could be helpful
or useful to the defense in impeaching or otherwise detracting from the probative force of the
prosecution's evidence[.]"

36.    This request was made pursuant to the Fifth, Sixth and Fourteenth Amendments to
the United States Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963).

37.    Under the *Brady* disclosure rule, the prosecution has a continuing obligation to
disclose material information favoring the criminal defendant in the possession, custody or
control of the District Attorney's Office or other law enforcement, especially where the defendant
specifically demands such disclosure.

38.    In a specific-demand case, the prosecutor's failure to disclose is likely to mislead
the defense into assuming that such evidence does not exist, and thus the prosecution's disclosure
obligation is heightened.

39.    In response to the defense's *Brady* request, a prosecutor from the Bronx County
District Attorney's Office wrote that he was aware of the Office's *Brady* obligations and would

6

FILED May 01 2013 Bronx County Clerk

comply with them.

**B.     The Trial in *People v. Felix***

40.     Plaintiff was held in custody continuously until the time of his trial, which began on or about November 8, 2004, in the Supreme Court, Bronx County (Boyle, J.S.C.).

41.     Plaintiff was represented at trial by appointed counsel from the Legal Aid Society, Olayinka Dan-Salami.  Assistant District Attorney Mary Jo Blanchard appeared for the People.

42.     On November 22, 2004, Sara Torres arrived at the courthouse to testify on behalf of the People.

43.     Prior to her testimony, Ms. Torres observed Plaintiff being led down the hallway into the courtroom and immediately recognized that he was not the man who had committed the shooting.

44.     Ms. Torres then told ADA Blanchard that Plaintiff was not the perpetrator.

45.     ADA Blanchard responded, in substance, that Ms. Torres was mistaken, that criminal defendants often change their appearance, and that Plaintiff certainly was the shooter.

46.     ADA Blanchard further told Ms. Torres, in substance, that Ms. Torres would be wrong not to identify Plaintiff as the shooter in court.

47.     ADA Blanchard called Ms. Torres to the witness stand and asked Ms. Torres whether she saw the perpetrator of the crime in the courtroom.  Ms. Torres responded that she did not.

48.     Shortly after Ms. Torres gave this testimony, but before her direct examination was completed, ADA Blanchard asked for a recess.

49.     Over defense objection, the court granted the recess and gave ADA Blanchard permission to have a private discussion with Ms. Torres.

50.     ADA Blanchard then had a private discussion with Ms. Torres in the hallway of the courtroom.

51.     Among those present during this conversation was ADA Michele Rodney, who had been observing the proceedings, and Ms. Torres's mother.

52.     During this conversation, Ms. Torres told the ADAs that Plaintiff was not the perpetrator and that the wrong man was on trial.  She began to cry.

53.     ADA Blanchard, in the presence of ADA Rodney, told Ms. Torres, in substance, that the defendant *was* the perpetrator, and that Ms. Torres would be wrong to continue to deny that she recognized Plaintiff on the witness stand.

54.     Ms. Torres then was called back to the witness stand by ADA Blanchard to continue her direct examination.

55.     As a result of the prosecutors' coercion, Ms. Torres, under questioning from ADA Blanchard, did not reveal that Plaintiff was *not* the shooter, but testified that she could not presently remember what the shooter looked like.

56.     ADA Blanchard had an obligation under the *Brady* rule to disclose Ms. Torres's exculpatory statements as well as the pressure that ADA Blanchard had put on Ms. Torres, but ADA Blanchard did not make any such disclosures.

57.     ADA Blanchard also had an obligation, under the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to

8

correct Ms. Torres's misleading testimony, but ADA Blanchard did not make any such correction.

58.     Instead, ADA Blanchard, pursuant to Criminal Procedure Law ("CPL") § 60.25, used Ms. Torres's claimed lack of present recollection of the appearance of the perpetrator to introduce into evidence Ms. Torres's prior identification of Plaintiff from the photo array.  ADA Blanchard did not elicit, or disclose to the defense, that such photo identification had been equivocal; Defendant MORALES had not disclosed such information to her.

59.     During her summation, ADA Blanchard argued, among other things, that the jury should convict Plaintiff because Ms. Torres had positively identified Plaintiff from a photo array. ADA Blanchard argued that Ms. Torres simply could not remember what the perpetrator looked like when she testified, even though ADA Blanchard knew that Ms. Torres actually was certain that Plaintiff was not the perpetrator.

60.     On December 9, 2004, the jury returned a verdict convicting Plaintiff of Attempted Murder, Assault, and Criminal Possession of a Weapon.

61.     On August 2, 2005, Elizabeth Sack Felber of the Legal Aid Society, on behalf of Plaintiff, filed a motion in the Supreme Court, Bronx County, to set aside Plaintiff's conviction pursuant to CPL § 330.30.

62.     In this motion, Ms. Felber argued, among other things, that Ms. Torres's testimony that she could not remember what the perpetrator looked like, which was the foundation for admitting her prior photo identification, was not credible.

63.     In opposition to this motion, ADA Blanchard argued that Ms. Torres's testimony

9

FILED  May 01 2013 Bronx County Clerk

*was* credible, even though ADA Blanchard knew this to be false.

64.     Despite her continuing obligation to disclose Ms. Torres's exculpatory statements

under the *Brady* rule, ADA Blanchard continued to withhold them.

65.     Crediting ADA Blanchard's arguments, the trial court denied Plaintiff's motion to

set aside the verdict.

66.     Plaintiff was sentenced to concurrent terms of imprisonment of twelve years each

for Counts One and Two, and nine years for Court Five, and was sent to prison to serve this

sentence.

**C.     The Post-Conviction Investigation and Exoneration of Darren Felix**

67.     Plaintiff continued to assert his innocence after his conviction, and Legal Aid

continued to re-investigate the matter.

68.     After concluding her post-conviction investigation, Ms. Felber presented to

District Attorney Johnson a memorandum discussing the new evidence she had uncovered.

69.     This memorandum included Ms. Torres's disclosure of the misconduct of

Defendant MORALES, *see* ¶¶ 25-32, and the misconduct of ADA Blanchard, *see* ¶¶ 43-66.

70.     The memorandum also cited new evidence from other witnesses proving that

Plaintiff was actually innocent of the crime.

71.     Following its own re-investigation of the case based upon the Legal Aid

memorandum, the D.A.'s Office ultimately agreed to vacate Plaintiff's conviction on the grounds

of newly-discovered evidence of Plaintiff's actual innocence. *See* Exh. A (Transcript of court

proceedings, dated May 7, 2010).  The D.A.'s Office did not address Plaintiff's allegations of

10

FILED May 01 2013 Bronx County Clerk

police or prosecutorial misconduct.

**D.      Plaintiff's Damages and Injuries**

72.    Plaintiff's injuries and damages include, but are not limited to:

(a)    His loss of liberty from the date the jury returned its verdict finding him

guilty through his release from custody;

(b)    His physical injuries, physical pain, and mental and emotional anguish, as

the result of assaults by other inmates and prison guards;

(c)    His past and future mental and emotional distress due to his wrongful

prosecution and conviction for crimes he did not commit and his wrongful

imprisonment for such crimes;

(d)    His loss of the services, society, companionship, and consortium of his

family members and friends; and

(e)    His loss of employment income, and diminution of future earning ability,

due to his prosecution and imprisonment, in an amount to be determined

by an economic expert.

### FIRST CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant City Of New York
For Actions Of The Bronx District Attorney's Office)**

73.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

through 72 as if fully set forth herein.

74.    The foregoing violations of Plaintiff's rights to Due Process and a Fair Trial under

the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and resultant

11

injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable

to Defendant City of New York, amounting to deliberate indifference to the Constitutional rights

of persons, including Plaintiff, subject to prosecution by the Bronx District Attorney's Office,

namely:

  (a)   the institution and implementation of plainly inadequate or unlawful policies,
        procedures, regulations, practices and/or customs concerning:

        i.    the Constitutional duty not to use false, misleading or unreliable evidence,
              testimony, statements or argument during criminal proceedings;

        ii.   the continuing Constitutional obligation to correct false, inaccurate,
              incomplete or misleading evidence, testimony, statements and argument,
              whenever such misconduct is discovered to have occurred;

        iii.  the continuing Constitutional duty to timely disclose to the appropriate
              parties, including the court and the defense, during criminal investigations
              and prosecutions, all material evidence or information favorable to a
              person suspected, accused or convicted of criminal conduct, including
              exculpatory evidence as well as evidence impeaching the credibility or
              undercutting the reliability of prosecution witnesses, and including verbal
              as well as recorded information; and

        iv.   the Constitutional duty to refrain from coercing or manufacturing false or
              inherently unreliable statements and testimony from witnesses;

  (b)   the failure to adequately instruct, train, supervise, and discipline their employees
        with respect to such matters.

  75.   The aforesaid policies, procedures, regulations, practices and/or customs

(including the failure to properly instruct, train, supervise and/or discipline employees with

regard thereto) were deliberately implemented or tolerated by policymaking officials for the

Defendant City, including, but not limited to, the District Attorney of Bronx County and his

delegates, who knew:

FILED May 01 2013 Bronx County Clerk

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c)    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the Constitutional rights of an accused and cause him Constitutional injury.

76.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

a)    numerous credible allegations, many substantiated by judicial decisions, some of which are listed in Exhibit B, which is incorporated herein by reference, that Bronx ADAs had violated their *Brady* and related disclosure obligations, had presented or failed to correct false or misleading testimony and argument, or had improperly coerced inherently unreliable statements or testimony from witnesses;

b)    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of prosecutors in New York State, including in Bronx County, to comply with that rule;

c)    judicial decisions putting the Bronx County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see, e.g., Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001); and

d)    the inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned Constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

77.    The deliberate indifference of the Bronx District Attorney to the aforementioned

13

Constitutional violations is evidenced by his failure to discipline *any* of the prosecutors

responsible for known instances of misconduct, including, but not limited to, the decisions

finding misconduct that are listed in Exhibit B hereto, or to refer such attorneys for disciplinary

investigation by the Appellate Division's Disciplinary or Grievance Committees.

      78.    The Bronx District Attorney further exhibited his indifference towards the types

of misconduct identified above through his hiring of Daniel McCarthy in 1992, and subsequent

naming of McCarthy as the head of trial training for the office in 1994. In 1990, just two years

before McCarthy's hiring, a judge in the Supreme Court, Queens County, found that McCarthy,

then a supervisor in the Queens D.A.'s Office, had personally concocted a scheme to withhold

from the defense *Brady* material in the form of a witness's cooperation agreement. The court, in

its decision in *People v. Steadman and Blair*, Ind. No. 3331/88 (Queens Co.) (attached as Exh.

C), wrote that it could not "adequately express in words its disgust" at the "charade" perpetrated

by McCarthy. Then, in 1993, a year before McCarthy was named Director of Training by

District Attorney Johnson, the Court of Appeals wrote in *People v. Steadman*, 82 N.Y.2d 1, 7

(1993), that McCarthy had *personally* made a "studied effort" to conceal this *Brady* material.

      79.    The Bronx District Attorney was further put on notice of his Office's problem

with the types of prosecutorial misconduct that occurred in Plaintiff's prosecution in the civil

rights lawsuit *Ramos v. City of New York*, Index No. 21770-93 (Bronx County), which was filed

on April 1, 1996, and resulted in the City of New York paying a record settlement of $5 million

on or about December 15, 2003. This settlement was widely reported. *See* Andrea Elliott, *City

Gives $5 Million to Man Wrongly Imprisoned in Child's Rape*, N.Y. TIMES, Dec. 16, 2003, at

FILED May 01 2013 Bronx County Clerk

B3.

80.     The Plaintiff in *Ramos*, like Plaintiff here, had been falsely convicted by the Bronx District Attorney's Office as a result of *Brady* violations, the reliance by prosecutors on false and misleading evidence, and the use by the prosecutor of a false or misleading summation. This conduct was set forth in the *Ramos* complaint and substantiated through discovery in that case.

81.     *Ramos* relied on 72 prior cases of similar prosecutorial misconduct, beginning in 1975 and continuing through 1996. Discovery in that case, before it settled, revealed that the present District Attorney had never disciplined *any* prosecutor for misconduct, despite a long and lamentable history of such misconduct before he was elected and during his own tenure.

82.     Following its reporting of the *Ramos* settlement, The New York Times conducted its own investigation into the disciplinary practices of the Bronx District Attorney's Office. The Times reported that Office had failed to discipline prosecutors for the types of errors that had occurred in the *Ramos* case, and, as a result, it was criminal defendants who "pa[id] the price." *See* Andrea Elliott & Benjamin Weiser, *When Prosecutors Err, Others Pay the Price*, N.Y. TIMES, Mar. 2, 2004, at 25. The Times articles are annexed as Exhibit D and incorporated herein by reference.

83.     Since the *Ramos* complaint was filed in 1996, courts have continued to find misconduct by Bronx prosecutors similar to that which was committed in the *Ramos* prosecution, and in Plaintiff's case. *See* Exhibit B. None of those cases has resulted in any discipline of the ADA responsible for the reported misconduct.

15

84.     Prior to, and following, the *Ramos* settlement, the Bronx District had no employee handbook, manual, or other document setting forth any disciplinary process for the aforementioned types of prosecutorial misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct. The knowledge that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants, even after all the publicity surrounding the *Ramos* settlement, encouraged prosecutors, including Plaintiff's prosecutor, to believe that such violations would go unpunished. *See generally*, Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors will be Disciplined by their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 FORDHAM L. REV. 537 (2011).

85.     The District Attorney's deliberate indifference to violations by his subordinates of his Office's Constitutional obligations foreseeably encouraged such violations to occur and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

86.     The aforesaid policies, procedures, regulations, practices and/or customs of the District Attorney, as policymaker for the Defendant CITY, were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

87.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Bronx County (or his authorized delegates) has final managerial

16

FILED May 01 2013 Bronx County Clerk

responsibility for training, instructing, supervising and disciplining attorneys and other

employees in his office regarding their conduct in the prosecution of criminal matters, including,

but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable

"evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense,

including post-trial, and to refrain from offering, and to correct, false or misleading evidence,

testimony, and argument during trial proceedings.

88.     The Bronx County District Attorney, personally and/or through his authorized

delegates, at all relevant times had final authority to promulgate and implement administrative

and managerial policies and procedures, including policies and procedures as to personnel hiring,

training, supervision and discipline, with respect to his Office's performance of its duties.

89.     The District Attorney of Bronx County at all relevant times was and is an elected

officer of Bronx County, one of the constituent counties of Defendant CITY, the Office was and

is funded out of the CITY's budget, and the Office was and is a New York City agency.

90.     Furthermore, the District Attorney was and is designated a "local officer," rather

than a "state officer," under the New York Public Officers Law (§ 2); and New York has

provided by statute (N.Y. County Law §§ 53, 941) that the CITY's constituent counties

(including Bronx County), and hence Defendant CITY itself, shall have liability for torts

committed by County officers and employees, such as the District Attorney and his assistants.

91.     The District Attorney of Bronx County personally and/or through his authorized

delegates, at all relevant times had final authority, and constituted a City policymaker for whom

the City is liable, with respect to the above-mentioned areas.

17

92.     During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

93.     By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

### SECOND CAUSE OF ACTION

**(42 U.S.C. §1983; Denial Of Due Process And A Fair Trial; Defendant Jose Morales)**

94.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 93 as if fully set forth herein.

95.     Prior to Plaintiff's conviction in 2004, and continuing thereafter, Defendant MORALES covered up and withheld knowledge from the Bronx District Attorney's Office and Plaintiff of *Brady* material in the form of Ms. Torres's tentative identification of Plaintiff and the efforts made by Defendant MORALES to make Ms. Torres's appear to be "sure" of her identification when in fact she was not.

96.     Defendant MORALES knew he had a duty, under the United States Constitution, as well as the laws and regulations of the State and the City of New York, to disclose the *Brady* material to the D.A.'s Office so that the latter could disclose it to the defense and so that the D.A.'s Office would not bring about the conviction of Plaintiff based upon false or misleading

18

FILED May 01 2013 Bronx County Clerk

evidence and argument.

97.     Notwithstanding this duty, Defendant MORALES, prior to, during, and following

Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to his legal

obligations, concealed the *Brady* material from, or otherwise failed to disclose the *Brady* material

to, the D.A.'s Office and thus to Plaintiff.

98.     He did so with the knowledge that his conduct would result in the jury being

provided false, misleading, or manufactured "evidence" concerning Ms. Torres's supposed belief

that Plaintiff was the perpetrator of the crime, which in turn would substantially increase the

likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

99.     The aforesaid conduct operated to deprive Plaintiff of his rights under the

Constitution and the Laws of the United States to timely disclosure of all material evidence

favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United

States*, 405 U.S. 150 (1972), and their progeny, and to not be convicted or punished based upon

the government's knowing use of false, misleading, or manufactured testimony or argument, all

in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution.

100.    The foregoing violations of Plaintiff's federal Constitutional rights by Defendant

MORALES directly, substantially, proximately, and foreseeably brought about Plaintiff's

conviction, his imprisonment until such time as his conviction was vacated, and his other injuries

and damages.

101.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and

FILED May 01 2013 Bronx County Clerk

were affected by actions taken under color of State law.

      102.    Defendant MORALES committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's Constitutional rights or to the effect of such misconduct upon Plaintiff's Constitutional rights.

      103.    By reason of the foregoing, Defendant Morales is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

    a.    For compensatory damages of not less than $14 million;

    b.    For punitive damages of not less than $14 million;

    c.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

    d.    For pre-judgment interest as allowed by law; and

    e.    For such other and further relief as this Court may deem just and proper.

FILED  May 01 2013 Bronx County Clerk

LAW OFFICES OF JOEL B. RUDIN

BY: JOEL B. RUDIN, ESQ.
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
Email: jbrudin@aol.com

*ATTORNEY FOR THE PLAINTIFF*

Dated: New York, New York
       May 1, 2013

21

FILED  May 01 2013 Bronx County Clerk

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF BRONX : CRIMINAL TERM : PART  50

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

4   THE PEOPLE OF THE STATE OF NEW YORK,       Indictment
                                                3449/03
5                    -against-

6   DARREN FELIX,

7                             Defendant.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9                        265 East 161st Street
                         Bronx, New York   10451
10                       May 7, 2010

11

12   B E F O R E:

13          HONORABLE DENIS J. BOYLE,
                              J u s t i c e.

14

15   A P P E A R A N C E S:

16          ROBERT T. JOHNSON, ESQ.
            District Attorney, Bronx County
17          BY:  JEFFREY GLUCKSMAN, ESQ.
                 Assistant District Attorney

18

19          OFFICE OF STEVEN BANKS
            Attorney for Defendant
20          1020 Grand Concourse
            Bronx, NY
21          By:  ELIZABETH FELBER, ESQ.

22

23

24                   Angela L. Conran, R.P.R.
                     Senior Court Reporter

25

FILED May 01 2013 Bronx County Clerk

2

Colloquy

1    (Defendant is not present at this time.)

2    THE CLERK:  Number 21 added to the Supreme Court

3    calendar, Darren Felix, Three Four Four Nine of 2003.

4    MS. FELBER:  Elizabeth Felber, Office of Steven

5    Banks.

6    MR. GLUCKSMAN:  Jeffery Glucksman for the Office

7    of the District Attorney.

8    Good morning, your Honor.

9    MS. FELBER:  Good morning.

10   THE COURT:  Counsel, good morning.

11   Ms. Felber, you want to waive your client for

12   purposes of this application?

13   MS. FELBER:  Yes, and I'm waiving his appearance.

14   THE COURT:  Who would like to start.

15   MR. GLUCKSMAN:  If I may begin, your Honor.

16   This was a matter that was tried before you, your

17   Honor, in late 2004.  The top count was Attempted Murder in

18   the Second Degree, after a jury trial conducted in front of

19   you, your Honor.  The defendant was convicted of that top

20   count.

21   There was subsequent unrelated 330 issue that was

22   conducted before you, your Honor, as I'm sure you recall,

23   with protracted hearings requiring numerous witnesses to

24   appear before you, supps, and then briefs by both sides.

25   And, subsequently, in you October of 2007, defendant was

FILED May 01 2013 Bronx County Clerk

3

Colloquy

1    sentenced by your Honor based on that jury verdict.

2         We're here before you today, your Honor, the

3    People are joining in an application by defense, by the

4    defendant, under 440.10 (1) (g) for vacating an order to

5    vacate his judgement of guilty or verdict of guilty based

6    on newly discovered evidence.

7         Your Honor, this evidence, we believe, that could

8    have not been produced by the defendant at trial, even with

9    his due diligence which is of such a nature and character

10   to create a probability that had such evidence been

11   received at that trial that the verdict would have been

12   favorable to the defendant and, basically, your Honor, the

13   People are waiving their right to have this motion in

14   writing, first, your Honor, and we're conceding the

15   following facts that we're going to state on the record

16   now, your Honor:

17        The Legal Aid Society, on behalf of their client,

18   Darren Felix, with due diligence, conducted an independent

19   investigation.  Their investigation and the results of

20   their investigation were revealed and then turned over to

21   the District Attorney around this past July of 2009.  That

22   case -- this case rather, the newly discovered evidence,

23   was assigned to myself and, along with an assigned

24   detective investigator from my office, we conducted our own

25   independent investigation using Legal Aid's investigation

FILED May 01 2013 Bronx County Clerk

4

Colloquy

1    as a jumping-off point, your Honor.

2         We are joining today with the Legal Aid Society

3    and we are conceding the following facts and newly

4    discovered evidence, your Honor:

5         Specifically, first, an individual was located who

6    is currently incarcerated in another state who at the time

7    -- who shortly after the shooting involved in this case,

8    which was July 23rd of 2003, resided for approximately six

9    months with an individual by the name of Justo, J-u-s-t-o,

10   Hechavarria, H-e-c-h-a-v-a-r-r-i-a, who admitted to him

11   that on July 23rd of 2003, at about 10:15 p.m., outside of

12   a Mc Donald's on 167th Street between Walton and Gerard

13   Avenue in the Bronx, he shot a person who we now know to be

14   Mr. Kantari, K-a-n-t-a-r-i, Baragi, B-a-r-a-g-i, and then

15   the next day fled this jurisdiction to abate discovery,

16   arrest and perhaps prosecution for that shooting, your

17   Honor.

18        The People interviewed this individual, as well as

19   did a background investigation of that individual and found

20   him to be credible.

21        A second person was found who was present at the

22   time of the shooting, and a witness to the incident, which

23   lead up to the shooting, as well as the shooting itself,

24   your Honor.  This individual's identity was never known to

25   law enforcement and, in fact, refused at some point to

FILED: May 01 2013 Bronx County Clerk

5

Colloquy

1    cooperate with the defense and only just last week was

2    persuaded to be interviewed by myself and a detective

3    investigator from my office.

4        This person, in sum and substance, your Honor,

5    based on their statement to my investigator, was the cause

6    of an argument which ensued between Mr. Justo Hechavarria,

7    who was -- and who is known to that witness for many years

8    prior to the July of 2003 incident and the victim who was a

9    stranger to the person, to this witness.

10       The witness described the escalation of an oral

11   argument, which began inside of the Mc Donald's and

12   continued out on to the street in front of it.  There the

13   witness described the victim chasing off Hechavarria with a

14   pipe, with a pipe-like object, which he got from a van

15   which was parked outside.  Further, the witness said that

16   Justo Hechavarria went off somewhere close by, within

17   minutes came back with a gun, and when the victim exited

18   the Mc Donald's, observed Justo Hechavarria shoot the

19   victim multiple times.

20       The witness' presence and vantage point was

21   independently corroborated by a videotape, which was

22   recovered from the scene that night from the Mc Donald's,

23   which I believe your Honor may have some familiarity with

24   because it was presented into evidence at this trial.

25       Further, the witness observed the defendant,

FILED May 01 2013 Bronx County Clerk

6

Colloquy

1   Darren Felix, who is only known to that witness casually as

2   Justo's cousin's boyfriend, who is not from the area nor

3   did he live in the area, who was at the scene approximately

4   one half block away at the moment that the shooting took

5   place, your Honor.  This witness did not even know Mr.

6   Felix by name or any kind of nickname at all and does not

7   know and was independent -- completely independent of the

8   first witness that I put on the record with regard to this

9   -- as part of the basis of this application, your Honor.

10  And that's that witness who resided, right after this

11  incident, with Mr. Justo Hechavarria.

12          Finally, based on our independent investigation

13  both Justo Hechavarria and Darren Felix are similar both --

14  are similar in physical appearance, they're both

15  approximately the same age, height, weight and complexion,

16  and based on our investigation, as well as independent

17  corroboration of a videotape, that both Mr. Felix and

18  Mr. Hechavarria were dressed almost identical to one

19  another that particular night of the incident.

20          Your Honor, based on the foregoing facts that we

21  are conceding, we respectfully submit that they support the

22  vacating of the conviction of Darren Felix, and we join in

23  Legal Aid's application to vacate the verdict pursuant to

24  440.10 subdivision (1) (g), your Honor.

25          THE COURT:  And at least implicit in that perhaps

Colloquy

1    you've already said expressly, would you be moving to

2    dismiss the indictment against Mr. Felix?

3              MR. GLUCKSMAN:  That's correct, your Honor.  We

4    believe that with this newly discovered evidence that the

5    People would be unable to meet our burden of proving

6    Mr. Felix guilty beyond a reasonable doubt, your Honor.

7              THE COURT:  Ms. Felber.

8              MS. FELBER:  I'll be brief, your Honor.

9              First of all, I want to thank Mr. Glucksman for

10   his integrity in this process.  After we completed our

11   investigation last June we handed over to Rob Johnson all

12   of our investigation.  He appointed Mr. Glucksman to look

13   into it and I thank him for his honesty and his diligence.

14             Just briefly, your Honor, on the facts, I just

15   would like to point out we had been looking for Justo from

16   the beginning, but it was our understanding, as

17   Mr. Glucksman points out, he fled to Pennsylvania.  He had

18   no criminal record at the time, so we had been unable to

19   obtain a photograph.

20             However, by some glint of some kind of

21   intervention, he was arrested after this trial in, I

22   believe, March of 2005.  And our incredibly hard-working

23   and talented hard-working investigators found his

24   photograph in the Pennsylvania correctional facility and we

25   were able to speak to him, which lead to the witness that

FILED  May 01 2013 Bronx County Clerk

8

Colloquy

1    Mr. Glucksman referred to, who confirmed he had confessed

2    to him a few times and, ultimately, it was very difficult

3    to find the woman who was present, but we ultimately found

4    her, however, as Mr. Glucksman pointed out.

5         Well, she did give us some false exculpatory

6    statements.  She did not come clean to defense counsel and

7    investigator, so that's all I have to say.

8         THE COURT:  Let me preface my ruling by saying

9    surely, as Ms. Felber put it well concerning

10   Mr. Glucksman's integrity.  I'll take this opportunity to

11   commend defense counsel and their staff and the Office of

12   the Bronx County District Attorney's Office.

13        Obviously, this is disturbing, but it's also

14   reassuring to know both sides pursued the ends of justice

15   so diligently, so I'm granting the motion to vacate the

16   verdict and the sentence and to dismiss the indictment.

17   I'll submit written findings consistent with Article 440 at

18   a future date, but the motion is granted at this time.

19        MR. GLUCKSMAN:  And certainly, your Honor, in your

20   preparation of your findings you require anything else, we

21   will be glad to provide it for you, your Honor.

22             (CONTINUED ON NEXT PAGE.)

23

24

25

8A

Colloquy

1        THE COURT:  Thank you.

2        MS. FELBER:  Your Honor, I do have the order for

3    his release.

4        THE COURT:  Okay.

5

6

7                    ****************

8

9    CERTIFIED TO BE A TRUE AND ACCURATE
     TRANSCRIPT OF THE STENOGRAPHIC MINUTES
10   IN THIS CASE:

11   *Angela L. Conran, RPR*

12   Angela L. Conran, R.P.R.
     Senior Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED May 01 2013 Bronx County Clerk

*Felix v. City of New York*, Index No. _____

Exhibit B

1.  *People v. Nunez*, 74 A.D.2d 805 (1st Dept. 1980): Assault conviction reversed due to pervasive prosecutorial misconduct during trial and summation which "raised the specter of lack of good faith and served to undermine justice."

2.  *People v. Gonzalez*, 74 A.D.2d 763 (1st Dept. 1980): Conviction reversed under *Brady* where ADA wrongfully suppressed notes impeaching complainant's credibility.

3.  *People v. Galloway*, 77 A.D.2d 542 (1st Dept. 1980), *aff'd* 54 N.Y.2d 396 (1981): Conviction affirmed despite finding the conduct by the prosecutor was so inappropriate in tone and civility as to support a referral of the ADA to the disciplinary committee. Prosecution attempted to mislead the jury into thinking that three people –not one–identified defendant. Although the Court of Appeals also affirmed the conviction, Judge Meyer, in dissent, criticized the prosecutor as so "determined to obtain a conviction at any cost," that he deprived the defendant of a fair trial.

4.  *People v. DeJesus*, 88 A.D.2d 554 (1st Dept. 1982): Murder conviction reversed for "persistent" and "relentless" "prosecutorial misconduct" during summation and otherwise.

5.  *People v. Hooper*, 87 A.D.2d 193 (1st Dept. 1982): Murder conviction reversed where ADA encouraged "patently suspect testimony" of an eyewitness and failed to disclose exculpatory material.

6.  *People v. Perez*, 90 A.D.2d 468 (1st Dept. 1982): Conviction reversed due to prosecutor's "persistent misconduct [during summation] which deprived the defendant of his right to a fair trial."

7.  *People v. Ellis*, 94 A.D.2d 652 (1st Dept. 1983): Weapon and drug conviction reversed for "highly improper" summation, in violation of Code of Professional Responsibility.

8.  *People v. Hicks*, 102 A.D.2d 173 (1st Dept. 1984): Assault conviction reversed because prosecutor's "reprehensible" summation "severely undermined the accused's right to a fair trial."

9.  *People v. Hudson*, 104 A.D.2d 157 (1st Dept. 1984): Rape conviction reversed for "egregious improprieties" during prosecutor's summation.

10. *People v. Rosa*, 108 A.D.2d 531 (1st Dept. 1985): Conviction reversed where the prosecutor "blatantly violated the defendant's rights" by "confusing and misleading" the jury, and pointing out the prosecutor in *Rosa* was the same as in *Perez* and was "on notice" about his improper behavior from the Court's prior decision.

11.  *People v. Bailey,* 121 A.D.2d 189 (1st Dept. 1986): Prosecutor criticized for striking "foul blows" during summation and violating duty to "refrain from improper methods calculated to produce a wrongful conviction."

12.  *People v. Gonzalez,* 120 A.D.2d 464 (1st Dept. 1986): Conviction reversed where ADA withheld exculpatory evidence in the form of grand jury testimony of a potentially exculpatory witness.

13.  *People v. Johnson,* 114 A.D.2d 210 (1st Dept. 1986): Robbery conviction reversed because "prosecutor's improper arguments during summation deprived the defendant of a fair trial."

14.  *People v. Hamilton,* 121 A.D.2d 176 (1st Dept. 1986): Robbery conviction overturned due to prosecutor's "grossly improper" misleading of the jury and "wholly improper" misleading summation.

15.  *People v. Ortiz,* 116 A.D.2d 531 (1st Dept. 1986): Conviction reversed where, among other things, prosecutor on summation "mis-characterized the defense."

16.  *People v. Velez,* 118 A.D.2d 116 (1st Dept 1986): Conviction reversed based on failure of the prosecution to timely produce evidence known to it in advance of trial which might have significantly impeached the testimony of the complainant, the key witness who testified against defendant.

17.  *People v. Bagarozy,* 132 A.D.2d 255 (1st Dept. 1987): Child sodomy conviction overturned for pervasive prosecutorial misconduct during trial and misleading and inflammatory evidentiary presentation and during summation.

18.  *People v. Qualls,* 70 N.Y.2d 863 (1987): Conviction reversed based on prosecutor's failure to disclose the existence of an express agreement between the prosecutor and a witness as to sentencing of the witness in an unrelated pending case.

19.  *People v. Castro,* 147 A.D.2d 410 (1st Dept. 1989): Hearing on § 440.10 motion ordered where co-defendant, unbeknownst to defendant at trial, had previously provided information to the police and prosecution that had been the source of defendant's arrest.

20.  *People v. Okafor,* N.Y.L.J. 9/8/89 at p. 21: *Rosario* and *Brady* violations found and conviction vacated where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case.

21.  *People v. Olmo,* 153 A.D.2d 544 (1st Dept. 1989): New *Wade* hearing ordered where it was discovered that key witness gave perjured testimony and the prosecutor may have known about it.

22.  *People v. Roman,* 150 A.D.2d 252 (1st Dept. 1989): Conviction reversed where

FILED  May 01 2013 Bronx County Clerk

prosecutor's improprieties on summation included, among other things, his attempt to give legal instruction to the jury, and his improper vouching for his own witnesses.

23.    *People v. Negron*, 161 A.D.2d 537 (1st Dept. 1990): Conviction reversed where, among other things, prosecutor delivered a misleading summation accusing defendant and his counsel of fabricating theory of defense.

24.    *People v. World*, 157 A.D.2d 567 (1st Dept. 1990): Conviction reversed where prosecutor denigrated defense theory of self defense, accused defendant of lying and tailoring his testimony to appear less culpable, suggested that defendant was not entitled to fair trial, and improperly vouched for credibility of eyewitness.

25:    *People v. Jorge*, 171 A.D.2d 498 (1st Dept. 1991): Conviction reversed for improper summation based on prosecutor's inflammatory comments.

26.    *People v. McReynolds*, 175 A.D.2d 31 (1st Dept. 1991): Conviction reversed based for prosecutor's improper impugning of defense counsel's integrity.

27.    *People v. Butler,* 185 A.D.2d 141 (1st Dept. 1992): Conviction reversed where prosecutor's summation was found to violate the Code of Professional Responsibility.

28.    *People v. Hernandez,* 185 A.D.2d 147 (1st Dept. 1992): Conviction affirmed, but prosecutor admonished regarding his summation and directed to receive training in order to refrain from future improper conduct.

29.    *People v. Lewis*, 174 A.D.2d 294 (1st Dept. 1992): Conviction reversed where prosecutor failed to disclose deal made with different prosecutor in another city; misled the jury that no promises were made.

30.    *People v. Mudd*, 184 A.D.2d 388 (1st Dept. 1992): Conviction reversed for numerous reasons, including the prosecutor's summation which was "directly contrary to the evidence."

31.    *People v. Shears*, 184 A.D.2d 357 (1st Dept. 1992): Conviction affirmed even though prosecutor improperly characterized defendant as a "magician," and improperly impugned defense witness's motives.

32.    *People v. Banfield*, 194 A.D.2d 330 (1st Dept. 1993), and *People v. Byfield*, 194 A.D.2d 331 (1ˢᵗ Dept. 1993): Convictions reversed where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants.

33.    *People v. Slaughter,* 189 A.D.2d 157 (1st Dept. 1993): Conviction reversed where, among other things,  prosecutor improperly vouched for witnesses during summation.

34.    *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD-5 of

eyewitness contradicting witness's trial testimony was withheld by prosecutor. The Court found that the People violated both *Brady* and *Rosario*.

35. *People v. Ramos*, 201 A.D.2d 78 (1st Dept. 1994): Conviction reversed for prosecution's pervasive failure to turn over *Brady* material related to credibility of complaining witness in child abuse case.

36. *People v. Rutter*, 202 A.D.2d 123 (1st Dept. 1994), and *People v. Bowen*, 234 A.D.2d 161 (1st Dept. 1996): Convictions reversed because, among other things, the prosecutor failed to disclose a transcript of a polygraph exam performed on the People's main witness containing both exculpatory and impeachment material.

37. *People v. Johnson*, 212 A.D.2d 362 (1st Dept. 1995): Conviction affirmed, but court found summation "improper," as the prosecutor's comments were "misleading."

38. *People v. Williams*, 212 A.D.2d 388 (1st Dept. 1995): Conviction reversed where prosecutor repeatedly ignored trial judge's rulings as to scope of questioning and argued on summation that defendant was guilty of other uncharged crimes.

39. *People v. Lantigua*, 228 A.D.2d 213 (1st Dept. 1996): Conviction reversed and dismissed where prosecutor failed to disclose that eyewitness was with another person when she allegedly saw the crime.

40. *People v. Collins*, 173 Misc.2d 350 (Sup. Ct. Bronx Co. 1997): Conviction set aside for prosecutor's failure to disclose complainant's history of mental illness and substance abuse.

41. *People v. King*, 241 A.D.2d 329 (1st Dept. 1997): Conviction reversed where prosecutor delayed turning over *Rosario* material.

42. *People v. Mikel*, 274 A.D.2d 325 (1st Dept. 1997): Conviction reversed where prosecutor failed to disclose that witness violated his cooperation agreement prior to trial by fleeing to Puerto Rico, and when he was returned, entered into a new cooperation agreement to cover the numerous felony charges stemming from his flight.

43. *People v. Ortega*, 241 A.D.2d 369 (1st Dept. 1997): Conviction reversed where, among other things, prosecutor failed to timely disclose the transcript of eyewitness's Grand Jury rebuttal testimony.

44. *People v. Olivero*, 272 A.D.2d 174 (1st Dept. 2000): Conviction reversed where, among other things, prosecutor "mischaracterized" evidence on summation.

45. *Morales v. Portuondo*, 165 F. Supp.2d 601 (S.D.N.Y. 2001): Convictions of two defendants unconditionally discharged based on prosecutor's failure to disclose key exculpatory evidence pointing to another perpetrator.

FILED May 01 2013 Bronx County Clerk

46.   *Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002): Suppression of favorable, material evidence that third party in custody in another jurisdiction had confessed to hiring hit man to kill shooting victim, was a *Brady* violation that required relief.

47.   *Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2002): On the last day of trial prosecution disclosed that an additional memo book from one of the police witnesses had not been turned over and was lost.

48.   *People v. Johnson,* 191 Misc.2d 105 (Sup. Ct. Bronx Co. 2002): Affirming conviction in re-trial, but noting that conviction in prior trial was vacated due to unspecified "*Rosario* and *Brady* violations."

49.   *People v. Bruno*, Ind. No. 0027/97, N.Y.L.J., 4/23/03 at p. 19: Conviction reversed where prosecutor withheld information casting doubt on the voluntariness of a confession.

50.   *People v. LaPorte*, 306 A.D.2d 93 (1st Dept. 2003): Conviction reversed where prosecutor improperly impugned defense counsel's integrity and ridiculed the defense.

51.   *People v. Spruill*, 5 A.D.3d 318 (1st Dept. 2004): Conviction reversed where prosecutor's summation comments improperly inflamed jury's emotions.

52.   *People v. Woods*, 9 A.D.2d 293 (1st Dept. 2004): Conviction reversed for *Crawford* errors at trial and also because prosecutor met with key witness alone in her office, and that witness could have viewed confidential records related to the trial.

53.   *People v. Poventud*, 10 Misc. 3d 337 (Sup. Ct. Bronx Co. 2005): Conviction reversed where prosecution failed to disclose that the only eyewitness had falsely identified an innocent third party.

54.   *People v. Aquilar,* 14 Misc.3d 1 (Sup. Ct. Bronx Co. 2006): Conviction reversed where prosecutor's comments on summation "exceeded the bounds of legitimate advocacy."

55.   *People v. Garcia*, 46 A.D.3d 461 (1st Dept 2007): Conviction reversed where "the prosecution wilfully suppressed evidence."

56.   *People v Ortiz*, 69 A.D.3d 490 (1st Dept 2010): Prosecutor engaged in "impermissible, prejudicial pattern of conduct" throughout trial and on summation.

FILED May 01 2013 Bronx County Clerk



FILED May 01 2013 Bronx County Clerk

SUPREME COURT, QUEENS COUNTY

CRIMINAL TERM, PART J-6

- - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK

     - against -

RAYMOND BLAIR, KEVIN GAINES,
GARY STEADMAN and KEENAN WYNN,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - X

BY: WILLIAM D. FRIEDMANN, J.

DATED:   APRIL 20, 1990

INDICTMENT NO. 3331/88

FOR THE MOTION

RUSSELL MOREA, ESQ. (Def. Blair)
123-60 83rd Avenue
Kew Gardens, New York 11415

MARVIN LANDOU, ESQ. (Def. Gaines)
85-21 Lefferts Boulevard
Kew Gardens, New York 11415

PAUL RUBENFELD, ESQ. (Def. Steadman)
125-10 Queens Boulevard
Kew Gardens, New York 11415

FRANK DAVIS, ESQ. (Def. Wynn)
295 Northern Boulevard Suite 302
Great Neck, New York 11021

IN OPPOSITION

HON. JOHN J. SANTUCCI
District Attorney, Queens County
BY: JACK WARSAWSKY, ESQ., A.D.A.
    JOHN SCARPA, ESQ., A.D.A.
125-01 Queens Boulevard
Kew Gardens, New York 11415

FILED May 01 2013 Bronx County Clerk

SUPREME COURT, QUEENS COUNTY

CRIMINAL TERM,   PART J-6

- - - - - - - - - - - - - - - - - - - - - - - -X
THE PEOPLE OF THE STATE OF NEW YORK     BY: WILLIAM D. FRIEDMANN,J.

       - against -                     DATED:   APRIL 20, 1990

RAYMOND BLAIR, KEVIN GAINES,          INDICTMENT NO. 3331/88

GARY STEADMAN and KEENAN WYNN,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - X

### OPINION OF THE COURT

Defendants moved at various times during this protracted trial (seven weeks), and at the close of evidence to dismiss the indictment (CPL 240.70) and/or in the alternative for a mistrial (CPL 280.10), upon the grounds of prosecutorial misconduct.

They urged that the prosecution failed to disclose "Brady Material" (Brady v. Maryland, 373 US 83) specifically a cooperation agreement or "deal" between the Queens District Attorney's office and the Queens Office of the Legal Aid Society on behalf of the alleged sole eye witness to a shooting which resulted in alternative charges of Murder in the Second Degree (PL 125.25 (1) (2)-(Intentional Killing or Depraved Reckless Conduct) being filed against the defendants.  Decision upon such motions was reserved.

### Contentions

In seeking dismissal sanctions and/or a mistrial, defendants contend that they were unduly prejudiced by the failure of the District Attorney's office and its trial attorneys to disclose the existence of a four point cooperation arrangement, which effected the eye witness' trial testimony.

FILED  May 01 2013 Bronx County Clerk

In substance that agreement provided:

    1) No jail time on three open felony cases in Queens County;

    2) Relocation before and after testimony;

    3) Preliminary living expenses; and

    4) Help in finding employment

The People in response contended that its trial attorneys were unaware of the terms of the cooperation agreement between the witness and or his attorney and a high level Assistant District Attorney, especially as it related to any promise of "no jail time". Further, that the existence of any such agreement should be considered a collateral matter since the witness himself was unaware of any promises made to his attorney on his behalf and therefore the agreement could not have constituted any kind of inducement which effected his trial testimony.

### Development of the Non-Disclosure Issue

During the trial the eyewitness testified with the assistance of his legal aid society attorney who guided him with respect to his constitutional rights and privileges. His testimony covered a period of five days. He with the indulgence of the court was exhaustively examined and cross-examined by all attorneys with respect to any cooperation understandings or arrangements. In an attempt to present for the benefit of the jury a complete picture concerning this issue, the court approved a defense counsel subpoena which facilitated the appearance of the witness' attorney, as a witness, with respect to the issue of the cooperation agreement.

2

FILED May 01 2013 Bronx County Clerk

## The Cooperation Deal

In summary an assessment of the trial record indicates that the four point cooperation agreement did in fact exist in the following operational context:

1) No concrete promises were made by the District Attorney's Office directly to the eyewitness;

2) As a result of the deal and in advance of trial the eyewitness did receive modest preliminary relocation, living and employment assistance;

3) The eyewitness hoped for favorable no jail time, in the future, with respect to his open Queens cases in exchange for his truthful trial testimony (consistent with information given to police a few days after the incident and his grand jury testimony);

4) The eyewitness' attorney confirmed that the four point agreement, _supra_, had been made by his Legal Aid office with a high level Assistant District Attorney, but that no promises had been made by any one in the District Attorney's office directly with or in the presence of the eyewitness;

5) The deal apparently was communicated by the witness' attorney to the witness, but shielded from trial disclosure by both the witness and his attorney, through their invocation at trial of the attorney-client privilege during their respective testimonies. (Prince, Richardson on Evidence, 10th Edition, Sections 409-423)

6) All aspects of the deal apparently were deliberately not communicated from the executive level of the Queens District Attorney's office to the trial attorneys in charge of the District

3

FILED May 01 2013 Bronx County Clerk

attorneys, despite their protests of ignorance of any or all of the promises made to the witness or his attorney, are chargeable with constructive knowledge of the entire arrangement. Restated, such agreement should have been disclosed to defendant's counsel prior to the start of the trial.

The remedy for such non-disclosure could result in a mistrial(CPL 280.10) and/or in sanctions including dismissal of the indictment (CPL 240.70).

Generally the courts of New York State and other jurisdictions have not sanctioned outright dismissal for failure to provide "Brady" Material. Research indicates that Appellate Courts, when confronted with the worst examples of prosecutorial misconduct, have not chosen dismissal as a remedy. The sanction that has been  mainly imposed is to set aside a conviction and order a new trial, (People v. Savvides, supra at p. 558; People v. Cwikla, supra at p. 445; and see (Gershman, Prosecutorial Misconduct, Section 5.6 [e] Violations of Discovery Rules, 1987).

In this case, the existence of the cooperation agreement was disclosed at the very last possible moment by the witness' attorney to defense counsel. The Court finds that thereafter there was a full and fair opportunity to cross-examine the eyewitness as to the facts and circumstances of  his cooperation and his knowledge of any consideration he would receive in exchange for his testimony. (People v. Keppler, 92 AD2d 1032).

The Court further with the aim of mitigating any prejudice to the defense allowed the defense to call the witness' attorney and allowed

5

FILED  May 01 2013 Bronx County Clerk

him to describe in detail the deal that was made between a high level member of the District Attorney's staff and himself on behalf of his client. The test to be applied is outlined in <u>People v. Kelly</u>, <u>supra</u> at p. 520 ie. balancing any prejudice to the defense against the interests of society. In this case, the defense on balance have not been able to prove actual prejudice nor lack of a fair trial, (<u>People v. Galloway</u> 54 NY2d 96). In fact, the non-disclosure as framed by the testimony of the eyewitness and his attorney could have adversely affected the jury's weighing of the eyewitness' total credibility with respect to all issues.

<u>Conclusions</u>

In denying defendants' motions to dismiss and/or for a mistrial in the context of this seven week-eighteen witness trial this court cannot adequately express in words its disgust that the trial was impacted by a shabbily structured cooperation charade. This charade caused great disruption and delay of this trial. The existence of the cooperation agreement should have disclosed prior to the start of the trial, and the fact that the trial district attorneys were unaware of it's existence in whole or in part (no jail term) as contended is immaterial.

Any reasonable interpretation of what happened here must conclude that the Queens office of the Legal Aid Society together with the executive level of the Queens District Attorney's Office improperly attempted to shield a witness from "Brady" evidence disclosure and from prospective relevant testimony that could be illicited through cross-examination by defense counsel. It is hoped that this

6

FILED May 01 2013 Bronx County Clerk

type of "cooperation" or "collusive action" concerning the non disclosure of cooperation agreements will never again be attempted by these two large law firms together or otherwise.

Order entered accordingly.

The clerk of the court is directed to mail a copy of this memorandum and order to the attorneys for the defendants, Queens District Attorney's Office and the Queens Legal Aid Office.

_____

WILLIAM D. FRIEDMANN, J.S.C.

7

FILED  May 01 2013 Bronx County Clerk
4/30/13
When Prosecutors Err; Others Pay the Price; Disciplinary Action Is Rare After Misconduct or Mistakes - New York Times

The New York Times                    **Archives**

# When Prosecutors Err, Others Pay the Price; Disciplinary Action Is Rare After Misconduct or Mistakes

By ANDREA ELLIOTT and BENJAMIN WEISER
Published: March 21, 2004

Milton Lantigua, a 20-year-old Dominican immigrant who helped his grandfather sell clothing from a van, insisted he was innocent when the police charged him with fatally shooting a man on a Bronx street in 1990. He was still insisting a year later, when the jury could not reach a verdict, and a year after that, when he was tried again, convicted and later sentenced to 20 years to life.

It was not until 1996, after Mr. Lantigua had served about five years in prison, that the criminal justice system came around to his view. A state appeals court reversed his conviction, saying that prosecutors in the Bronx had allowed their chief witness to perjure herself, and had failed to disclose the existence of a potential second witness who might have helped the defense.

New York State paid Mr. Lantigua $300,000 to settle a lawsuit over his wrongful conviction, but no prosecutors paid a professional price.

The Lantigua case is one of a handful of Bronx cases in the last 15 years in which serious misconduct or error by prosecutors has led to wrongful convictions and people sent to prison. District Attorney Robert T. Johnson and his aides say that none of their prosecutors have engaged in deliberate misconduct, and that the reversals -- which they say are often made on minor, technical points -- represent less than 1 percent of the hundreds of felony convictions won by the office each year.

Yet in all but one of the handful of cases, in which the misconduct and mistakes ranged from inappropriate closing arguments to the failure to disclose critical evidence, prosecutors escaped discipline. They were neither punished by their superiors nor publicly sanctioned by the State Supreme Court committee that investigates wrongdoing by lawyers. Many continued to receive merit raises and rise through the ranks.

In one heralded case, a day care teacher, Alberto Ramos, was convicted of raping a young girl and served seven years in prison before it was revealed that prosecutors had failed to disclose information that cast serious doubt on the girl's accusations. After Mr. Ramos's conviction was vacated, the city paid him a $5 million settlement in December, and his lawyer sharply questioned the Bronx's record in disciplining prosecutors. The lawyer, Joel B. Rudin, recently provided The New York Times with the internal personnel records of more than 70 Bronx prosecutors in cases in which courts cited errors, misjudgments and other forms of prosecutorial misconduct.

An examination of those records, and interviews with prosecutors, defense lawyers and defendants, offer a rare look at prosecutorial wrongdoing: how it happens, the costs that are paid -- both human and financial -- and what, if anything, is ever done to those responsible.

"Most of the time, when prosecutors withhold evidence, no one finds out about it," said Mr. Rudin, who took the Ramos case after a private investigator for the city discovered documents that pointed to Mr. Ramos's innocence. "It took a freak accident to expose it."

Misconduct by prosecutors has become a national concern in recent years, highlighted last month in a United States Supreme Court decision to throw out a Texas inmate's death sentence because prosecutors had deliberately withheld critical evidence. In a study last year, the Center for Public Integrity, a group that monitors government ethics issues, reported that from 1970, there had been more than 2,000 cases of prosecutorial misconduct in the United States that resulted in dismissed charges, reversed convictions or reduced sentences.

In the Bronx, Mr. Johnson and his staff said, prosecutors are constantly striving to ensure fairness for defendants, citing hundreds of cases they dismiss each year because of problems with evidence or other factors. "In thousands of cases, some mistakes are inevitable," Mr. Johnson said in a statement.

"Where there is an allegation or finding of prosecutorial misconduct," he added, "we deal with it on an individual basis with the assistant involved." In some cases, his aides said, a lecture to the offending prosecutor was considered sufficient. In others, prosecutors resigned or left the office for private practice before the reversals were handed down.

"Not one of them involves a finding of deliberate or intentional shielding or concealment of evidence," Mr. Johnson's deputy, Barry Kluger, said of the reversals. "They were technical rulings or a slip of the tongue." The aides emphasized that several of the cases involving reversals because of prosecutors' errors were tried before Mr. Johnson was elected in 1989.

It is not known whether the performance of Bronx prosecutors is any worse than that of others. The Times reviewed dozens of Bronx cases since 1989 in which a conviction was reversed at least in part because of prosecutorial misconduct or error. What follows is an examination of cases that reveal the human dimensions of a problem that seldom receives a public airing.

## A Key Witness Withheld

It was after midnight on June 27, 1990, when Felix Ayala was found bleeding on a Bronx street from a fatal shot to the head, after what the police said was an argument among several men. About a month later, a woman who said she had witnessed the killing from a bedroom window was being driven around the neighborhood by the police when she pointed out Milton Lantigua as the man who had fired the gun. Mr. Lantigua was charged and jailed in the shooting.

FILED  May 01 2013 Bronx County Clerk

The woman, Frances Rosario, became the chief witness against him, even though an appeals court would later say that her trial testimony was "confusing, inarticulate, vague, frequently inaudible and extremely hesitant."

One curiosity was that she repeatedly spoke as if she had been with someone else at the time of the killing, using "we" rather than "I" in recalling what she had seen. But when asked about the discrepancy during cross-examination, she told the jury: "I was probably nervous and I said 'we.' I was by myself."

After Mr. Lantigua's first trial ended in a hung jury, prosecutors offered him a deal, he recalled: plead guilty to a lesser charge of weapons possession, and be sentenced only to time served -- an extraordinary outcome for a man who had been accused of murder. "They would let me go," he said.

He refused the offer, he said, because he was not guilty of anything. He was retried, convicted of second-degree murder and sentenced to 20 years to life in prison.

But in the meantime, new questions about the reliability of the prosecution's key witness, Ms. Rosario, had emerged. A new defense lawyer, Joel S. Cohen, obtained an affidavit in which she recanted her testimony that Mr. Lantigua had been involved in the shooting. In a hearing, a prosecutor revealed that Ms. Rosario had told the prosecution that she had in fact been with a man, identified only as Jo-Jo, on the night of shooting. And as an appeals court would later rule, the prosecution let Ms. Rosario testify falsely that she had been alone.

That ruling, handed down in 1996 by the Appellate Division of State Supreme Court, threw out Mr. Lantigua's conviction, saying he had been denied a fair trial because of errors, and conduct by prosecutors that it called "especially egregious."

In strong language, the court said the prosecution's failure to disclose the existence of the potential new witness had denied the defense the opportunity to investigate what that witness might have observed, or to meaningfully cross-examine Ms. Rosario on "her whereabouts, her view of the unfolding events, any distractions caused by the presence of another person, and her general credibility."

The ruling cited the failure of the trial prosecutor, Sophia Yozawitz, to correct Ms. Rosario's testimony that she had been alone during the shooting. "The prosecutor permitted the statement to remain on the record without informing the court that it was perjured," the court said, adding that a prosecutor "is charged with the duty not only to seek convictions but also to see that justice is done." The court also found that Ms. Yozawitz had distorted evidence during her summation to the jury, which also warranted reversal.

Irving Cohen, the lawyer for Mr. Lantigua who negotiated a $300,000 settlement with New York State and is representing him in a civil-rights lawsuit against New York City, said the ruling revealed a lack of oversight and discipline in the district attorney's office. "I think the case was given to an assistant district attorney who, because of her lack of training and supervision in that office, was dedicated to getting a conviction without looking at the case in a critical way," he said.

Ms. Yozawitz left the district attorney's office before the conviction was reversed. Reached by telephone, she said she had been unfairly portrayed in the ruling, but could not comment because of Mr. Lantigua's pending lawsuit. "Otherwise," she said, "I wouldn't stop speaking."

In an earlier proceeding, she contended that Ms. Rosario had been credible, and that the potential new witness, Jo-Jo, would have corroborated the identification. His existence, she said, was not the kind of exculpatory information that prosecutors are obliged to turn over to the defense.

Senior aides to the district attorney offered a broad defense of their office's actions, noting that a judge had found Ms. Rosario's recantation not credible. Ms. Yozawitz's failure to correct Ms. Rosario's testimony that she had been alone was an honest mistake, they said.

Mr. Lantigua, who is now 33, suggests he has paid too great a price for the prosecution's errors. "They don't want to say they made a mistake," he said.

Evidence Left in a File

Alberto Ramos was 21 and had no criminal record when he took a part-time job in January 1984 as a teacher in the city-financed Concourse Day Care Center on East Mount Eden Avenue in the Bronx. A month later, a 5-year-old girl whose class he supervised during a 15-minute nap period accused him of raping her in a bathroom.

Mr. Ramos was actually one of five men charged, over three months, of raping or sexually abusing children at city day care centers in the Bronx. In the midst of a national fervor to aggressively prosecute sex abuse of children, he was convicted of first-degree rape and sentenced to 81/3. to 25 years in prison.

Even before the sentencing, he started a campaign to overturn his conviction, bringing numerous motions and appeals in state and federal courts, but to no avail.

Diana Farrell was a fast-rising 29-year-old prosecutor when she landed the Ramos case a month before the trial. She presented powerful testimony to jurors: the girl took the stand and re-enacted the rape, using dolls.

A classmate testified that she had seen Mr. Ramos go into the bathroom with the 5-year-old. Medical records showed that the girl, who was first examined two days after the alleged incident, had vaginal bruising. Perhaps the strongest testimony came from a doctor who had examined the girl and concluded that she had been abused because she could provide "such an accurate description of everything that happened."

It took the jury less than a day to convict. But it took much longer for the remarkable turn of events that would eventually free Mr. Ramos.

FILED   May 01 2013 Bronx County Clerk

Four years after Mr. Ramos went to prison, the city hired a private investigator, Anthony Judge, to help defend it against a civil suit brought by the girl's mother. He asked to see the case file of the Human Resources Administration, which had investigated the incident before Mr. Ramos was indicted.

"I was astounded to read what I read," Mr. Judge said in a recent interview.

In the file were documents that the agency had sent Ms. Farrell in a manila envelope at the end of the trial. The documents showed inconsistencies in the girl's story: she had told social workers that Mr. Ramos did nothing but tape her mouth. Teachers had noted that before the alleged abuse, the girl showed extensive knowledge about sexual acts, was seen placing dolls "in an intercourse position" and masturbated frequently in class, according to the documents.

Neither the jury nor the defense in Mr. Ramos's trial ever saw those documents, because the prosecution never turned them over, a judge later ruled. All but two of the documents were later discovered in Ms. Farrell's file. But in an interview, Ms. Farrell said she never saw them and did not know how they got there. She said she had seen a statement from a day care teacher and a document that mentioned the girl's masturbating and sexual knowledge. She did not turn these over to the defense, she said, because she did not think they qualified as exculpatory evidence.

The private investigator shared the documents with Mr. Ramos's mother in 1991, after the city settled with the girl's mother. Mr. Ramos hired Mr. Rudin, who was representing three of the other men accused of sex abuse in the day care centers. And in June 1992, Mr. Ramos's conviction was vacated in a State Supreme Court ruling that found that the prosecutor had failed to turn over evidence during his trial that could have led to his acquittal.

"The greatest crime of all is an unjust conviction," Judge John P. Collins said. "It is truly a scandal which reflects unfavorably on all participants in the criminal justice system."

Shortly after the ruling, the State Supreme Court's Departmental Disciplinary Committee, which looks into complaints of wrongdoing by lawyers, opened an investigation into Ms. Farrell's conduct during the trial. The Bronx district attorney asked the committee to hold off its investigation pending an appeal of the reversal. In 1993, Ms. Farrell resigned because of personal reasons, she said.

In 1994, an appeals court panel affirmed the decision vacating the conviction, and the disciplinary committee proceeded with its investigation.

The committee's procedures and findings are usually kept secret unless a decision is made to take public action, like censuring, suspending or disbarring a lawyer. The panel questioned Ms. Farrell several times, then dropped the investigation, said Ms. Farrell and officials in the district attorney's office.

"If they thought I had done something improper, there would have been a letter, a censure," said Ms. Farrell, who is retired. "I know I've done nothing wrong."

Mr. Rudin questioned why the committee did not allow him to present evidence about the case, aside from a transcript of the appeals hearing.

All four of the other Bronx sex-abuse cases were eventually overturned. Mr. Ramos's $5 million check arrived at his lawyer's office in the mail on Dec. 5, but he is angry that prosecutors were never seriously disciplined.

"They had in their possession a lot of favorable evidence that would have helped me greatly," said Mr. Ramos, who is now 41, "and they just chose to keep it under the table."

Crossing a Fine Line

Not all examples of prosecutorial misconduct involve failing to turn over critical evidence or allowing jurors to hear false testimony. But the consequences of even lesser violations can be serious: convictions may be reversed, even some that may be supported by the evidence.

Three times over the career of William E. Racolin, another Bronx prosecutor, he was cited by appeals courts for violations. Two of the cases were reversed in the mid-1980's, and the third in 1992. In each ruling, judges found problems with his cross-examination tactics, his summation, or both. In the third case, People v. Butler, a judge cited errors by Mr. Racolin in his summation.

The decision cited, for example, inflammatory comments by Mr. Racolin during his summation, including, "It's a tragedy for good people to have to listen to defendant's contentions." After the defense objected, he continued, "And it is pure, unadulterated hogwash."

The defendant, Kevin Butler, who was convicted of fatally shooting Ismael Quiles in 1988, later pleaded guilty to manslaughter and is still serving his prison sentence, said Martin Lucente, the lawyer who represented Mr. Butler in his appeal.

"There are many, many fine lines that a prosecutor has to face," said Mr. Racolin, 59, who is retired. "If you're going to try to impeach the evidence that is presented by the defense, it is almost impossible not to make a mistake." An official in the prosecutor's office said that after the reversal in the Butler case, the only one of the three involving Mr. Racolin to occur during Mr. Johnson's tenure as district attorney, "Mr. Racolin was reprimanded by his supervisor, and based on the totality of his performance, including this case, he received no pay increases for the next two years."

Mr. Racolin recalled in an interview that he was spoken to after the reversal, although he said he did not remember being denied pay increases. Regardless, he said, he always strove to respect the rights of defendants, and did not think his mistakes were significant enough to warrant reversal.

Whoever is right, it is clear that prosecutors in Mr. Johnson's office feel perceptions of prosecutorial abuses are exaggerated. "The term 'prosecutorial misconduct' is very broad," Mr. Johnson said, "and could run the gamut from an inadvertent error to an intentional abuse, and rarely have we seen a flagrant abuse which would be subject to appropriate administrative action."

But critics question whether prosecutors' offices in the Bronx and around the country are understating the seriousness of the problem and the need for more discipline. "It's so infrequent," said Bennett L. Gershman, a Pace Law School professor and former assistant Manhattan district attorney, "that you have to say that these offices have an ethos or culture where they don't want to deter their lawyers from being aggressive, being champions of the victims."

Home | Times topics | Member Center

Copyright 2013  The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword

FILED   May 01 2013 Bronx County Clerk
4/30/13                         City Gives $5 Million to Man Wrongly Imprisoned in Child's Rape - New York Times

**The New York Times**                            **Archives**

# City Gives $5 Million to Man Wrongly Imprisoned in Child's Rape

By ANDREA ELLIOTT
Published: December 16, 2003

A man who spent seven years in prison after he was wrongfully convicted of raping a girl at a Bronx daycare center won a $5 million settlement from the city, his lawyer announced yesterday.

A spokeswoman for the city's law office, Kate O'Brien Ahlers, said it was believed to be the largest false-conviction award in city history.

The man, Alberto Ramos, 40, said that while in prison he endured beatings, was sodomized and tried to commit suicide several times. His conviction was overturned in 1992 when a judge found that the prosecutor had withheld evidence that could have resulted in an acquittal.

"Court decisions overturning wrongful convictions don't seem to bring about meaningful reform," said Joel Rudin, Mr. Ramos's lawyer, in a statement released yesterday. "Maybe forcing the city to pay multimillion-dollar damage awards finally will."

Mr. Ramos was one of five men convicted of sexually abusing children at three city-run day care centers in the Bronx during the mid-1980's. All of the convictions have since been reversed.

In 1985, Mr. Ramos, then 22, was sentenced to 25 years in prison. He appealed the decision several times but his appeals were rejected.

Then, when the complainant in the criminal case and her mother sued New York City for civil damages, new evidence surfaced that led in 1992 to the reversal of Mr. Ramos's conviction. The judge found that the prosecutor had withheld evidence that would have strengthened Mr. Ramos's case.

The evidence uncovered during the civil lawsuit was "astounding," Mr. Rudin said.

City child abuse investigators said that they had referred the Ramos case to the Bronx district attorney's office for prosecution even though they believed that Mr. Ramos was innocent and that the child's story was false.

Day care center officials said the child had a history of sexual behavior in the classroom. They testified that they not only told the trial prosecutor about evidence favoring Mr. Ramos but had also informed other prosecutors before Mr. Ramos was arrested. No prosecutor disclosed the information to the defense.

The city appealed the 1992 ruling and lost. Then Mr. Ramos filed a civil suit for damages. The city settled it on Sept. 4, Ms. O'Brien Ahlers said, and the check was received last week.

"This settlement brings closure to 18 years of criminal and civil litigation for all parties involved," she said.

Home | Times topics | Member Center

Copyright 2013  The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword