UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DARREN FELIX,                                    :

                 Plaintiff,          :

            -against-               :        13-CV-03079 (ALC)(JCF)

THE CITY OF NEW YORK,                            :
DETECTIVE JOSE MORALES,
                         :

             Defendants.           :

-------------------------------------------------------x

---

**PLAINTIFF'S MEMORANDUM OF LAW OPPOSING
DEFENDANTS' MOTION TO DISMISS UNDER
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

---

JOEL B. RUDIN
LAW OFFICES OF JOEL B. RUDIN
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600 (Phone)
(212) 980-2968 (Fax)
Email: jbrudin@aol.com

*Attorney for Plaintiff*

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

    POINT I

    DEFENDANT CITY OF NEW YORK IS LIABLE, UNDER *MONELL*,
    FOR PROXIMATELY CAUSING THE ADAS' *BRADY* VIOLATION . . . . . . . . . . . 15

        A.    Plaintiff Has Made Out A Plausible *Brady* Violation At Trial
            As Well As A Claim That The Prosecutor Violated His Due
            Process Rights By Relying Upon False Or Misleading
            Testimony And Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.    This Court Is Bound To Follow Second Circuit Case Law
            Holding That A Municipality May Be Held Liable For A
            County District Attorney's Managerial Policies, Including
            A Personnel Policy Of Indifference To Prosecutorial Misconduct . . . . . 19

        C.    The Complaint States A Plausible Claim That The Bronx District
            Attorney's Deliberate Indifference To *Brady* Violations And
            Related Summation Misconduct Was A Substantial Cause Of
            Plaintiff's Constitutional Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    POINT II

    THE COMPLAINT PLAUSIBLY ALLEGES A *BRADY* VIOLATION BY
    DET. MORALES; QUALIFIED IMMUNITY DOES NOT APPLY . . . . . . . . . . . . . . 35

        A.    The *Brady* Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        B.    Qualified Immunity Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITIES

*Case*                                                                                    *Page*

*Amnesty America v. Town of West Hartford*, 361 F.3d 113
    (2d Cir. 2011)................................................................... 28, 33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................ 1, 2

*Babi-Ali v. City of New York*, 979 F.Supp. 268 (S.D.N.Y. 1997)........................... 33

*Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988)........................................ 20

*Banks v. Dretke*, 540 U.S. 668 (2004)................................................ 18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................................ 1

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989)............................................ 31

*Botello v. Gammick*, 413 F.3d 971 (9th Cir. 2005)................................... 21

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001)....................................... 16, 36-37, 42

*Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999)............................. 21

*Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999).................................. 21

*Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011)................................. 32n, 33

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1998)................................... 24

*Collins v. City of New York*, 923 F.Supp.2d 462 (E.D.N.Y. 2013)......................... 31-32

*Cone v. Bell*, 556 U.S. 449 (2009)................................................ 16

*Connick v. Thompson*, 131 S. Ct. 1350 (2011)................................... 27, 28, 32, 33

*Crane v. State of Texas*, 766 F.2d 193 (5th Cir. 1985)............................... 21

*Disorbo v. Hoy*, 74 Fed. Appx. 101 (2d Cir. 2003)................................... 33

*Drakeford v. City of New York*, 6 A.D.3d 302 (1st Dept. 2004).......................... 21-22

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986)...................................... 28, 33

| *Case* | *Page* |
|---|---|
| *Frank v. Relin*, 1 F.3d 1317 (2d Cir. 1993) | 20 |
| *Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) | 20 |
| *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991) | 20, 28, 31, 33n |
| *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) | 21, 22-23 |
| *Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010) | 16, 37 |
| *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) | 31 |
| *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989) | 28 |
| *Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011) | 41 |
| *Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) | 31 |
| *Hope v. Pelzer*, 536 U.S. 730 (2002) | 41 |
| *Imbler v. Pachtman*, 424 U.S. 409 (1976) | 23 |
| *Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000) | 24 |
| *Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002) | 15, 19 |
| *Johnson v. Kings County Dist. Attorney's Off.*, 308 A.D.2d 278 (2d Dept. 2003) | 21, 26 |
| *Johnson v. Louisiana*, 2010 WL 996475 (W.D. La. Mar. 16, 2010) | 23 |
| *Jones v. City of New York*, 2013 WL 6814796 (E.D.N.Y. Dec. 20, 2013) | 25, 26, 26n |
| *Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006) | 41 |
| *Jovanovic v. City of New York*, 2010 WL 8500283 (S.D.N.Y. Sept. 28, 2010) | 23 |
| *Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565 (2d Cir. 2011) | 1 |
| *Kyles v. Whitley*, 514 U.S. 419 (1995) | 16, 18, 36 |
| *Leatherman v. Tarrant Co. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993) | 23, 26 |

| Case | Page |
|------|------|
| *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) | 16, 18, 19, 37 |
| *Malley v. Briggs*, 475 U.S. 335 (1986) | 39-40 |
| *Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) | 41 |
| *Mayes v. City of Hammond*, 442 F. Supp.2d 587 (N.D. Ind. 2006) | 37, 42-43 |
| *McMillian v. Monroe County*, 520 U.S. 781 (1997) | 21, 23, 26 |
| *Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002) | 34 |
| *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) | 41 |
| *Monroe v. Pape*, 365 U.S. 167 (1961) | 40 |
| *Morales v. Portuondo*, 165 F.Supp.2d 601 (S.D.N.Y. 2001) | 34 |
| *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998) | 20, 21, 26n, 39 |
| *Northington v. Marin*, 102 F.3d 1564 (10th Cir. 1996) | 40 |
| *Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980) | 23, 24, 25, 26 |
| *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) | 24 |
| *People v. Lantigua*, 228 A.D.2d 213 (1st Dept. 1996) | 34 |
| *People v. Lindsay*, 42 N.Y.2d 9 (1977) | 6 |
| *People v. Ramos*, 201 A.D.2d 78 (1st Dept. 1994) | 34 |
| *Perry v. New Hampshire*, 132 S. Ct. 716 (2012) | 39 |
| *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) | 42 |
| *Pinaud v. County of Suffolk*, 52 F.3d 1139 (2d Cir. 1995) | 20 |
| *Poventud v. City of New York*, 2014 WL 182313 (2d Cir. Jan. 16, 2014) | 2, 15-16, 35 |
| *Ramos v. City of New York*, 285 A.D.2d 284 (1st Dept. 2001) | 21, 26, 34 |
| *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) | 41 |

| Case | Page |
|------|------|
| *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119 (2d Cir. 1991) | 1, 28, 31 |
| *Smith v. Cain*, 132 S. Ct. 627 (2012) | 16 |
| *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) | 42 |
| *Strickler v. Greene*, 527 U.S. 263 (1999) | 18-19 |
| *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003) | 15, 16, 18 |
| *United States v. Agurs*, 427 U.S. 97 (1976) | 35 |
| *United States v. Emmenegger*, 329 F.Supp.2d 416 (S.D.N.Y. 2004) | 25-26 |
| *United States v. Lanier*, 520 U.S. 259 (1997) | 41 |
| *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) | 16 |
| *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) | 22, 25, 26n |
| *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995) | 27-28, 32n |
| *Vineyard v. County of Murray, Georgia*, 990 F.2d 1207 (11th Cir. 1993) | 28 |
| *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) | *passim* |
| *Watts v. Laurent*, 774 F.2d 168 (7th Cir. 1985) | 40 |
| *White v. McKinley*, 519 F.3d 806 (8th Cir. 2008) | 41-*42* |
| *Whitmore v. State*, 55 A.D.2d 745 (3d Dept. 1976) | 22 |

### Constitutional and Statutory Provisions                      Page

United States Code

      Title 42, Section 1983 ................................................ *passim*

Federal Rules of Civil Procedure

      Rule 8(a) ................................................................... 1

      Rule 12(b) ................................................................ *passim*

***Constitutional and Statutory Provisions***       ***Page***

New York Criminal Procedure Law

       Section 60.25.............................................................. 6

***Other***

Andrea Elliot and Benjamin Weiser, *When Prosecutors Err, Others
Pay the Price*, N.Y. TIMES, March 21, 2004.............................................................. 34

Benjamin Weiser and Andrea Elliott, *Wrongfully Convicted Man Wins
$1 Million Settlement*, N.Y. TIMES, Feb. 5, 2005.............................................................. 34

Bradfield, *et al.*, *The Damaging Effect of Confirming Feedback on the
Relation Between Eyewitness Certainty and Identification Accuracy*,
87 J. Applied Psychol. 112 (2002).............................................................. 38

Corey Kilgannon, *City to Pay $3.5 Million to Wrongfully Imprisoned
Queens Man*, N.Y. TIMES, Oct. 17, 2008.............................................................. 18n

Gary L. Wells & Amy L. Bradfield, *Good, You Identified the Suspect:
Feedback to Eyewitnesses Distorts Their Reports of the Witnessing
Experience*, 83 J. Applied Psychol. 360 (1998).............................................................. 38-39

Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors will be
Disciplined by their Offices or the Bar: Three Case Studies that Prove that
Assumption Wrong*, 80 FORDHAM L. REV. 537 (2011).............................................................. 29-30

Restatement (Second) of Torts.............................................................. 40

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted in opposition to Defendants' motion to dismiss the complaint pursuant to F. R. Civ. P. 12(b)(6). Defendants contend that Plaintiff Darren Felix's Complaint fails to state a plausible claim against the individual defendant, Det. Jose Morales, and the municipal defendant, the City of New York, because it does not allege a material *Brady* violation, because Morales has qualified immunity, and because the City of New York is not legally responsible under 42 U.S.C. § 1983 for the unlawful managerial or administrative policies and practices of a county district attorney's office such as Bronx County.

A pleading must contain a "short and concise statement of the claim showing that the pleader is entitled to relief." F. R. Civ. P. 8(a)(2). Under this rule, "a complaint must contain sufficient factual matter, accepted as true ... [to support] 'a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the plausibility of the complaint, the court must give the plaintiff the benefit of all reasonable inferences from the pleaded facts, which the Court must accept as true. *Id.*; *see also Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565, 567 (2d Cir. 2011) (citation omitted). The facts alleged in the Complaint need not be admissible at trial, *see Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123-24 (2d Cir. 1991), and need not suffice to *prove* Plaintiff's claim, but need merely show Plaintiff's claim is *plausible*.

Here, rather than give Plaintiff the benefit of all reasonable inferences from the pleaded facts, the Defendants rely on a highly selective summary of what occurred at trial which obscures the egregious *Brady* violations that occurred, and their consequence. In violation of his own Police Department's requirements, Det. Morales concealed that key eyewitness Sara Torres initially did not identify Plaintiff as the perpetrator, but said only that he looked "similar."

Meanwhile, he wrote a report, and gave sworn hearing and trial testimony, which made it falsely appear that she had immediately made an unequivocal, positive identification.  Meanwhile, Assistant District Attorney Mary Jo Blanchard knowingly elicited false testimony by Ms. Torres, and falsely argued in her summation, that Ms. Torres no longer had the ability to identify the perpetrator because she had repressed his facial features when, in truth, Ms. Torres had just told her that she had seen Mr. Felix outside the courtroom and he was *not* the shooter.  The above acts of misconduct plainly were material or prejudicial, as Ms. Torres was by far the most important identification witness.

As for the *Monell* liability issue, as we demonstrate below, assuming the truthfulness of the factual allegations in the Complaint and of all reasonable inferences from such facts, the Complaint easily satisfies the *Iqbal* pleading standard of plausibility.  Meanwhile, an unbroken line of Second Circuit decisions hold that municipalities such as New York City may be held responsible under § 1983 for a county district attorney's administrative or personnel policies which result in constitutional violations at trial.  The City argues that a more recent Supreme Court decision dealing solely with the distinct issue of absolute immunity somehow overrules the Second Circuit cases dealing with municipal liability, but their argument is a non-sequitur.  This Court is not free to disregard binding Second Circuit precedent because of *dictum* in a Supreme Court case about a totally different issue.

Notably, this a *Brady*-violation lawsuit, not a false arrest or malicious prosecution case.  Neither probable cause to arrest, nor "guilt," is in issue.  *See Poventud v. City of New York*, –– F.3d ––, 2014 WL 182313, at *10 (2d Cir. Jan. 16, 2014) (*en banc*) (*Brady* claim concerns solely whether the Plaintiff received a fair trial, not underlying guilt or innocence).  Yet Defendants, in support of their Rule 12(b)(6) motion to dismiss, attach various police reports and other

2

materials which appear to relate to "probable cause" only. Aside from the fact that the Bronx D.A.'s Office, after reinvestigating this case following Mr. Felix's trial conviction, took the remarkable step of voluntarily vacating the conviction because of the overwhelming evidence of his innocence, the police documents Defendants rely upon are irrelevant to the *Brady* claims made in this case. This lawsuit is solely about whether police and prosecutors altered, obscured, or lied about the evidence to ensure a conviction, thereby violating Plaintiff's constitutional right to a fair trial and entitling him to compensation for the years he spent in prison as a result.

Defendants contend they may rely on excerpts from the trial record in connection with their Rule 12(b)(6) motion, because they are matters of public record or were relied upon by Plaintiff in bringing suit. *See* Defts. Mem. 3-4. We do not object, and rely upon herein additional excerpts from the trial record in the interest of completeness.[1]

## STATEMENT OF FACTS

Kantara Baragi was shot outside of a McDonald's Restaurant on July 23, 2003, at approximately 10 p.m., following an argument inside the premises. When police approached Darren Felix nearby because he fit the general description of the shooter, he ran.[2] Following Felix's arrest, police displayed him in a one-on-one street show-up and a witness, Adam

---

[1]Defendants note that the court has authority to convert a motion to dismiss into a motion for summary judgment. *See* Defts. Mem. 4 n.1. Here, as we point out in this memorandum, the court cannot possibly rule *as a matter of law* on whether there were material *Brady* violations because it does not have the full trial record – significant portions of the trial have not yet been transcribed. As to Plaintiff's *Monell* claim involving the D.A.'s office, the Defendants have submitted no extra-record materials at all. Plaintiff, in support of the plausibility of his *Monell* claim, relies on the contents of his Complaint, attachments to the Complaint, and a law review article cited in the Complaint citing relevant evidence obtained in prior lawsuits.

[2]Mr. Felix explained that he ran because there was a warrant for his arrest in New York County on an unrelated matter for which he had failed to appear in court. *See* Defts. Exs. B, C. (Post-Arrest Statements of Darren Felix).

Rodriguez, identified him.  Later that day, in the hospital, the unfortunate Mr. Baragi, who was in "great pain," lying on a trauma table, and about to go into surgery, was told by police they had a suspect and then identified Felix at a similarly suggestive hospital bed show-up.  *See* Defts. Ex. K.  These facts established probable cause for arrest.  But this case is about *Brady*.

One week after the incident, Det. Morales showed Sara Torres, a 15-year-old employed at the McDonald's who claimed to know the shooter because he was a repeat customer, a photo array containing Felix's photo and five fillers.  Thereafter, Morales prepared a police report or DD5 stating: "Ms. Torres [] *positively identified* the person in position number (2) as the same person who she has known for approximately One (1) year and the same person who shot the complainant numerous times on the day in question."  Defts. Ex. G (emphasis added).

However, the Complaint alleges, this report was materially misleading and omitted information that was plainly favorable to Plaintiff under *Brady*.  Torres did *not* initially identify Felix at all, but she said only that his photograph "looks like" the shooter.  Cpt., ¶ 24.  NYPD policy required Morales to record this statement and to disclose it to the District Attorney.  Cpt., ¶ 28.  It also forbade Morales from making suggestive comments that might influence the witness's identification or reinforce it.  *Id.*  Nevertheless, after Torres failed to positively identify the photo, Morales asked her if she was "sure" of her "identification," and after she said she was "sure," he improperly reinforced her selection by telling her she had selected the individual who already had been arrested for the crime.  Cpt., ¶¶ 25-26.  He then prepared a DD5 that omitted her initial non-identification, omitted his suggestive, reinforcing comments to her, and reported only that she had made a "positive" identification.  Cpt., ¶ 31.  He failed to disclose any of the above information to prosecutors.  Cpt., ¶ 32.

During a pretrial hearing dealing with the lawfulness of Felix's arrest, interrogation, and

identification, Morales continued to cover up Sara Torres' statement while misleading the court, the defense, and even the prosecution.  He testified he had shown Sara the photo array, asked her if she recognized anyone, and then: "She sees the photo array.  She says number two, that's the guy who has been coming in for approximately like a year trying to pick me up.  He is the same guy who got into an argument with the victim and then after, he is the same guy who shot the victim."  Plf. Ex. 1 (11/8/04 Hearing Tr.), p. 64.  Morales testified that Sara signed underneath Felix's photo to "indicate her choice."  *Id.*, p. 66.  He did not reveal either her initial statement of non-identification or his suggestive statements reinforcing her "identification."

Prior to testifying at trial on November 22, 2004, Sara, then 17 years of age, observed Felix being led down a hallway into the courtroom and immediately recognized that he was *not* the man she had seen commit the shooting.  Cpt., ¶ 43.  She told this to ADA Blanchard.  Cpt., ¶ 44.  Blanchard told her she was mistaken, that criminal defendants change their appearance, that Felix certainly was the shooter, and that she would be wrong not to identify him in court.  Cpt., ¶¶ 45-46.   Blanchard did not reveal Sara's exculpatory statements in court.  Cpt., ¶ 56.

Taking the witness stand, Sara recounted that the shooter had come into the McDonald's many times and had flirted with her and tried to pick her up, and she described his physical appearance.  Tr. 10-13 (Defts. Ex. D).  She testified at great length about her excellent ability to observe the incident leading up to the shooting, and the shooting itself.  Tr. 11-12, 14-16.  She claimed the person's name began with a D.  Tr. 12.  However, she said that while she could still recognize the person who did the shooting, she did not see him in the courtroom.  Tr. 7-8.

During a recess, Blanchard, indicating surprise at this testimony, asked the court if she could speak with Sara "to ask her a couple of questions.  *I'm not certain if she understood all of my questions* on the stand specifically dealing with identification procedures and whether or not

5

she would be able to recognize somebody still.  So, I would like to just inquire of her if she did

understand it ... ."  Tr. 29-30 (emphasis added).  Over defense counsel's objection, the judge

agreed, while *prohibiting defense counsel from being present.*  Cpt., ¶¶ 48-49; Tr. 30-31.

      In the presence of another ADA, Michele Rodney, and Sara's mother, Sara again said

that Felix was not the perpetrator and that the wrong man was on trial, and she began to cry.

Cpt., ¶ 52.  Blanchard responded once again that Felix *was* the perpetrator, and urged Sara not to

deny this on the witness stand.  Cpt., ¶ 53.  Once again, the ADAs did not reveal Sara's

statements to the defense or to the court despite their *Brady* obligation.  Cpt., ¶ 56.

      Following the recess, Blanchard led Sara to give false testimony purporting to "correct"

her earlier statement.  Sara now said that while she once had a "clear picture" of the shooter's

face immediately after the shooting, *she no longer had such a recollection.*  Tr. 32-33.  Asked

why, she responded: "I was scared.  Ain't nobody want to see somebody get shot.  I didn't want

to remember that face.  It's been three years now ... .  I was scared."  Tr. 33.  Blanchard then

asked: *"So, you wouldn't be able to identify anybody one way or the other today; is that*

*correct*?", to which Sara responded, "Yes."  *Id.* (emphasis added).

      During another recess the following day, Blanchard requested permission, under N.Y.

Criminal Procedure Law § 60.25(1)(a)(iii), to introduce the photo array and Sara's "positive"

identification of Felix into evidence.  Tr. 56-57 (Defts. Ex. E).  Although photo identification

evidence ordinarily is inadmissible in New York, *see People v. Lindsay*, 42 N.Y.2d 9, 12 (1977),

such evidence may be admitted where an eyewitness, based upon present recollection, *no longer*

*is able to state whether the defendant is the perpetrator.*  Blanchard cited Morales' hearing

testimony that Sara had positively identified Felix as the shooter and pointed out that, based

upon that testimony, the court had upheld the lawfulness of the identification procedure, which

the court confirmed. Tr. 56-57, 66-67. Indeed, the court ruled it would admit the photo array testimony because, "as proven at the Wade hearing before me, the photo array itself was not suggestive ... The identification of Ms. Torres was clearly, constitutionally obtained ... ." Tr. 76. The only witness at the hearing concerning the Torres identification had been Det. Morales.

Following this recess, Blanchard questioned Sara further. First, she had Sara agree that her previous day's testimony – "that you didn't have a clear picture of the shooter in your mind" – was "still true." Tr. 85. Then she elicited that, a "[c]ouple of days after she shooting," Sara had identified "the shooter" from a photo array, at a time when she had a "clear picture in your mind of what the shooter looked like." Tr. 85-86. Finally, Blanchard led Sara to testify she was "sure" at the time she had "picked out the right person" and that "as you sit here today you're still sure ... ." Tr. 86.

Defense counsel, Legal Aid Society attorney Olayinka Dan-Salami, having been excluded from the meeting between Blanchard and Sara, handled the cross-examination of Sara carefully. He tried to get asked Sara to confirm that when she originally looked around the courtroom, she did not "see" the shooter, but Sara corrected him: "I said I didn't *recognize* anybody ... ." Tr. 88 (emphasis added). He then brought out that she had seen the shooter many times, Tr. 89-99, and tried to get her to admit, "Shooter is not here, right?", but she again corrected him: "Yes. I didn't *recognize* anybody," Tr. 99 (emphasis added). Dan-Salami then brought out that during the recess she had talked with Blanchard and another ADA about "not recognizing the person who did the shooting" and about her "identification." Tr. 103-04. However, not knowing what her answers would be, Dan-Salami did not take the risk of asking her open-ended questions seeking the substance of her discussion with the ADAs.

Following Dan-Salami's cross-examination, Blanchard requested an instruction from the

7

trial judge that she had been entitled to speak to Sara before her testimony and that the court had given her permission to speak with Sara during the recess in Sara's direct examination. Tr. 112-13. While Dan-Salami did not object to such an instruction, he pointed out, "Judge, we were not there. We don't know what happened." Tr. 113. The court gave the instruction. Tr. 117-18. Subsequently, on re-direct, Blanchard still again reinforced Sara's testimony that she had not "recognized" the shooter in court, not because Felix was not the shooter (as Sara had told Blanchard), but because she no longer remembered the shooter well enough to make an identification:

> Q.   Now Sara, before we took a break yesterday when you were testifying, before we took the break, were you able to recognize anybody in the courtroom?
>
> A.   No.
>
> Q.   Before we took a break, did you have a clear picture of what the shooter's face looked like?
>
> A.   No. ... [Objection overruled]
>
> Q.   We took a break, right, and did you speak to myself and ADA Rodney, right?
>
> A.   Yes.
>
> Q.   After you spoke to us you came back into the courtroom, right?
>
> A.   Yes.
>
> Q.   And you came back in to testify?
>
> A.   Yes.
>
> Q.   When you came back into the courtroom, could you recognize all of a sudden somebody in the courtroom?
>
> A.   No.

8

Q.      When you came back into the courtroom, did you all of a sudden have a clear picture of the shooter's face in your mind?

A.      No.

Q.      As you sit here today, Sara, right now, [do] you have a clear picture of the shooter's face in your mind?

A.      No.

Q.      *So, you can't tell us whether or not the defendant is or isn't the shooter; is that correct?*   [Objection overruled]

A.      Yes.

Tr. 136-37 (emphasis added).

Defense counsel did not give up.  On re-cross, he again tried to accredit Sara's close observation of the shooter at the time of the incident and on many prior occasions, in order to discredit her insistence that she could no longer remembered the shooter's face.  Tr. 137-148. But Blanchard then undid this re-cross with a few simple questions:

Q.      Sara, in your memory of this person who order[ed] Nestea without ice, do you see a face?

A.      No, not anymore.

Q.      Not anymore.  Back on July 30th of 2003, couple of days after the shooting, at that point in time, did you have a memory of his face? ... [Objection overruled]

A.      Yes.

Q.      At that point in time, July of 2003 were you able to recognize his face and pick him out of a photo array?

9

A.   Yes. (Tr. 148).[3]

Defendants contend that whatever happened with Sara was not material to the trial's

outcome because an eyewitness, Adam Rodriguez, and the shooting victim, Kantara Baragi, also

identified Felix at trial as the shooter. They attach the testimony of Rodriguez, but not Baragi.[4]

Rodriguez, a sanitation worker, testified he briefly saw an altercation outside

McDonald's and saw a man fire shots, at which point he immediately told his partner, "Let's get

out of here." 11/16/04 Tr., pp. 7-13, reproduced as Defts. Ex. H.  Half an hour later, police

asked him to view "an individual in custody," and he identified Felix.  Asked by Blanchard, he

agreed he was "100 per cent sure." Tr. 19.   He also identified Felix in court.  Tr. 50.

However, defense counsel's cross-examination effectively undercut the reliability of

Rodriguez's identification testimony.  Counsel brought  out that Rodriguez made his brief

observation from a moving truck, Tr. 60, that he immediately drove away after the shooting

began and lost sight of the shooter, Tr. 64, that he only saw the side of the shooter's face, Tr. 63,

and that there was "nothing distinctive" about the shooter that he noticed, Tr. 74.  Rodriguez

acknowledged that when he identified Felix in the street he was aware multiple police officers

were holding him in custody, essentially surrounding him, Tr. 95-97, and that he identified the

"shooter" solely based upon Felix's wearing of a t-shirt and his profile, Tr. 82-83.   The

suggestiveness of this show-up procedure was further established by Det. Morales'

acknowledgment that, when Rodriguez viewed Felix in the street, Felix was virtually surrounded

---

[3]Defendants have not attached the testimony of Det. Morales.  However, it is apparent Morales
testified at trial that the photograph that Sara Torres selected from the array was that of Darren Felix.  *See*
Defts. Ex. E, pp. 64-65, 75-76.

[4]As of this writing, Baragi's testimony has not been transcribed.

10

by police and handcuffed. *See* Plf. Ex. 1, pp. 42-43.  Rodriguez admitted that, when he

identified Felix in court, he was aware that Felix was the only person at counsel table who could

possibly have been the perpetrator. Defts. Ex. H, p. 75.  While he claimed to remember the

general appearance of the shooter, he was unable to remember the appearance of others involved

in the incident, including the girl with the shooter, Tr. 61-62, 67-70, and he could not even

remember whether the ADA he dealt with in the grand jury was a man or a woman, Tr. 77-79.

In the absence of any transcript of Baragi's testimony, it is unclear how the court is to

evaluate the strength of the Baragi identification testimony.  Nor have Defendants included the

defense or prosecution summations, to see how the respective lawyers dealt with the evidence

and how the factual issues were framed for the jury.  However, Blanchard's summation, which

we attach as Ex. 2, shows the importance of Sara's identification testimony.

Blanchard unwittingly exploited Det. Morales' *Brady* violation by arguing the

importance of Sara's positive identification of Mr. Felix, "just six days after the shooting, when

Sara had everything fresh in her mind."[5]  Tr. 58.  Repeatedly Blanchard emphasized the

immediate, unequivocal nature of the identification, telling the jury:

> [Sarah] looked at this photo array with the defendant's picture
> from the night he was arrested and said *that's him.  Number two,*
> *that's him*.  She told the detective that and she signed her name,
> Sarah Torres. ... And she said that after being handed this piece of
> paper [the photo array] for the first time.

*Id.* (emphasis added).  Sara did so, Blanchard argued, at "the point in time when she knew who

this was," from a photo array as to which "[t]here is *nothing suggestive* ... .  Sarah looked at this

---

[5]Sara Torres' name is spelled "Sara" and "Sarah" throughout the trial transcript.  We have used
Sara.

and said, *that is him. That's the guy I saw shooting outside the McDonald's.*" Tr. 60 (emphasis added).

Whereas Blanchard's exploitation of Det. Morales' *Brady* violation was unwitting, she knowingly and deliberately misled the jury about Sara's present inability to tell whether Darren Felix was the man whom she saw commit the shooting. Although Sara had told her, twice, that Felix was *not* the man, Blanchard falsely argued at length that Sara no longer could make any identification because, traumatized, she had blotted out the face of the shooter from her mind:

> The human brain is an interesting thing. We do lots of things to protect ourselves so maybe we can sleep at night. She told you from this witness stand that night was scary. I quit working there soon after, and I've been spending all this time trying to forget. That happens, ladies and gentlemen. This young girl has been trying to forget probably the scariest night of her entire life. Hopefully, she will never have another night like that. She remembers the basics. She remembers a lot about essentially what happened, but the face, her connection, I knew that guy. Her connection, I saw him many times before. That's what she had to get up. She may have been able to get that face out of her mind so she could sleep that night ... .

> Ladies and gentlemen, I submit to you, the point in time when it mattered, the point in time when she knew who this was, she selected the defendant in that photo array. ...

> Ladies and gentlemen, different people react differently to traumatic situations. The fact that Sarah couldn't identify anybody in court, *she didn't say he's not here*. She said I can't remember anymore. That happens.

Tr. 59-60 (emphasis added). Of course, the Complaint alleges that Sara *did* say "he's not here."

Blanchard then argued that Sara's testimony, which she *knew* was false, was so compelling that, even if the jury disregarded the other evidence, it sufficed to convict:

> On Sarah Torres' testimony *alone* you can convict the defendant.
> *We have met our burden on Sarah Torres' testimony alone*.

Tr. 60 (emphasis added).

With respect to the strength of evidence of guilt apart from Sara's testimony, Blanchard, in her summation, had to deal with three inconvenient circumstances. First, when Felix was arraigned in court, he had dark sneakers, even though the eyewitnesses had reported that the perpetrator definitely wore white sneakers. Defts. Ex. H, pp. 67-68. The best Blanchard could do was to speculate that somehow Felix had switched sneakers with another prisoner at Central Booking, perhaps because the sneakers had blood on them. Plf. Ex. 2, pp. 61-63. This argument, besides being utterly speculative, made no sense: if Felix's sneakers had blood evidence on them, they would have been taken as evidence by the police. Second, none of the eyewitnesses observed the perpetrator with any tattoo, even though Felix had prominent tattoos on each side of his neck. *Id*., pp. 8-10. This was particularly significant with respect to Sara's testimony, since she had observed and interacted with the perpetrator a dozen times, including for an extended period of time on the night of the shooting. Defts. Ex. E, pp. 97-100. Third, when Felix was approached by police just prior to his arrest a few minutes after the shooting, he was standing in front of 1240 Walton Avenue, which was just a block or so from the McDonald's where the shooting had occurred. It made little sense, if he had been the one who had shot the victim multiple times and knew that police were all over the area investigating, that he would make himself so vulnerable to identification and arrest. (In fact, as the D.A.'s Office later learned, the real shooter fled the scene and the next day fled the City.)

During deliberations, notwithstanding the present Defendants' claim that the evidence of guilt was overwhelming, the jury, even without knowledge of the exculpatory evidence, initially

reported itself deadlocked, 8-4. Plf. Ex. 3 (Jury Note Proceedings), pp. 73-74. Only after an *Allen* charge did it convict Felix of attempted murder. He then received a sentence of 12 years. Plf. Ex. 4 (Sentencing Transcript), pp. 23-24.

Following a re-investigation of the case, Legal Aid wrote the District Attorney with new-found evidence of Felix's innocence as well as the statements of Sara and her mother establishing the police and prosecutorial *Brady* violations. Plf. Ex. 5. After conducting an independent investigation, the D.A.'s Office confirmed Felix's original story to police that the real shooter was Justo Hechevarria, a young black man who had a very similar physique and who was similarly dressed to Felix at the time of the shooting. Cpt., Ex. A, pp. 3-6. The D.A.'s office interviewed and credited two new witnesses: the girl who was with Justo Hechevarria and provoked the original incident, and a close friend of Justo's. *Id.*, pp. 4-5. The girl confirmed that the shooter was Justo. *Id.*, p. 5. Justo's friend reported that Justo had confessed the shooting to him. This friend had nothing to gain by his statement and did not know either the girl or Darren Felix. *Id.*, p. 4. Based upon this new evidence, the People moved to vacate Mr. Felix's conviction and to dismiss the indictment with prejudice, and he was freed from prison.

14

**ARGUMENT**

**POINT I**

**DEFENDANT CITY OF NEW YORK IS LIABLE, UNDER**
***MONELL*, FOR PROXIMATELY CAUSING THE ADAS'**
***BRADY* VIOLATION**

A.     **Plaintiff Has Made Out A Plausible *Brady* Violation At Trial As Well As A Claim**
        **That The Prosecutor Violated His Due Process Rights By Relying Upon False Or**
        **Misleading Testimony And Argument**

        If Plaintiff's factual allegations, and the inferences from such facts, are credited, as they

must be for purposes of Defendants' 12(b)(6) motion, there unquestionably was a *Brady*

violation committed by prosecutors Blanchard and Rodney at trial, while Blanchard committed

the even more egregious constitutional violation of knowingly using and arguing false evidence.

*See, e.g., Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003); *Jenkins v. Artuz*, 294 F.3d 284, 292-

93 (2d Cir. 2002).  The City's argument that the defense *knew* the withheld information and

simply failed to exploit it is untrue.

        Sara's out-of-court statements constituted "favorable" information under *Brady* for two

reasons.  First, it was *exculpatory*.  She knew the shooter from numerous prior encounters, and

from a lengthy observation of him prior to and during the shooting, yet she told Blanchard and

Rodney that Darren Felix was *not* the shooter.  What could possibly be more exculpatory than

that?  Second, her statements were impeaching of her in-court testimony that she had erased the

appearance of the shooter from her mind and that she knew the person she had identified at the

photo array was the true perpetrator.  To the contrary, she had just told Blanchard and Rodney

that she could tell that Felix was *not* the shooter.  Numerous cases hold that such information,

either as exculpatory or impeaching, must be disclosed under *Brady*.  *See Poventud*, 2014 WL

182313, at *11 (holding plaintiff stated a proper § 1983 claim under *Brady* by alleging the

15

NYPD failed to disclose victim's identification of someone *other* than plaintiff as the shooter); *Goudy v. Basinger*, 604 F.3d 394, 399-400 (7th Cir. 2010) (undisclosed eyewitness statements that defendant was *not* the shooter material under *Brady*); *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (granting writ of habeas corpus upon finding People suppressed witness's statement contradicting the identification witnesses' account of the shooting); *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (material suggesting alternative perpetrator is *Brady* material).

     *Brady*, of course, requires that undisclosed evidence not just be favorable to the defense, but also that it be material to the outcome, defined as "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). However, this "does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

     Moreover, the *Brady* standard is not the only prejudice standard that applies to Plaintiff's claims. To prevail on his claim that the prosecutor caused him to be wrongfully convicted by knowingly relying on false testimony or argument, Plaintiff need only establish a reasonable *possibility* that the deception of the fact-finder affected the outcome. *See Su v. Filion*, 335 F.3d at 127; *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) ("reversal is virtually automatic" if government knowingly permits false testimony) (citation and quotations omitted).

     Here, Defendant City contends it is entitled to dismissal because there is no set of facts under which Plaintiff's claim that the *Brady* violation was material may succeed. They contend that Felix would have been convicted anyway on the strength of the other evidence, essentially the identification testimony of eyewitness Rodriguez and victim Baragi. However, as we have

shown, *see* pp. 10-11, *supra*, Rodriguez's testimony was substantially impeached.  As for Baragi, the Defendants have not even provided his testimony for the Court to evaluate.

At the very least, Plaintiff is entitled to the inference that Baragi's testimony did not have the case-dispositive effect that Defendants suggest.  Baragi, like Rodriguez, did not know the shooter, and he made his show-up identification under even more suggestive circumstances: lying in an ER bed, in critical condition, in "great pain," and about to undergo surgery.

While the Court does not have the benefit of Baragi's testimony, it does have Blanchard's summation, and it makes clear how important Sara Torres' identification testimony was.  Blanchard urged the jury to convict on *Sara's testimony alone*.  She did so because Sara *knew* the shooter and thus her "positive" photo identification was entitled to great weight.  Indeed, she argued Sara's credibility and the case-dispositive importance of *her* testimony for six pages of her summation.  Given this emphasis by the prosecutor herself on testimony she *knew* was false, this Court cannot possibly conclude, as a matter of law, after giving Plaintiff the benefit of all reasonable inferences from the evidence, that the prosecutor's misconduct did not affect the outcome within the meaning of either, or both, of the applicable materiality standards.

The Court also has not been provided defense counsel's summation, which presumably highlighted weaknesses in the People's case.  However, we do know that, in response to it, the prosecutor was forced to deal with three significant weaknesses: Felix had black sneakers when he was arraigned in court, even though the eyewitnesses described the shooter as wearing white sneakers; Felix had two highly conspicuous tattoos on both sides of his neck, which Sara, who had seen the shooter on a dozen occasions, did not describe; and, minutes after the shooting, Felix was hanging out on the street, just a block away from the shooting, even though the shooting had occurred on the sidewalk and, if Felix had done it, he had every reason to hide.

17

The Second Circuit's decision in *Leka* is highly instructive.  There, as here, two

eyewitnesses who were not the subject of the *Brady* claim identified the defendant at trial and at

lineups.  The State failed to disclose the statement of a third eyewitness, who had seen a portion

of the incident from his window, and whose account conflicted with the eyewitnesses's

testimony about how the shooting had occurred.  *See Leka*, 257 F.3d at 92-93.  Notwithstanding

the independent testimony of the eyewitnesses, the Court of Appeals granted habeas relief

because the non-disclosure was material.  *Id.* at 103-07.  *See also Kyles v. Whitley*, 514 U.S. at

453-54 (*Brady* violations as to other witnesses material even though they did not directly affect

the reliability of two additional identification witnesses).  Similarly, in *Su v. Filion*, 335 F.3d at

126-30, three eyewitnesses accused the defendant of shooting the victim, but the Court of

Appeals granted habeas relief because of the prosecutor's misconduct in presenting, and arguing

the "truthfulness" of, false testimony by one witness concerning his motives for testifying.[6]

Defendants maintain that somehow it was defense counsel's fault for not eliciting the

exculpatory information that Blanchard had failed to disclose and for failing to fully expose

Blanchard's deceit.  But Defendants are blind to the realities of trial practice and to the case law,

under which defense counsel need not assume the prosecutor is acting in bad faith.  *See Banks v.*

*Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must

seek,' is not tenable in a system constitutionally bound to accord defendants due process.

'Ordinarily, we presume that public officials have properly discharged their official duties.'")

(internal citations omitted); *Strickler v. Greene*, 527 U.S. 263, 285 (1999) (rejecting that defense

---

[6]Su's subsequent § 1983 lawsuit against New York City, on an identical theory of municipal liability to the one Plaintiff pursues here, resulted in a $3.5 million settlement.  *See* Corey Kilgannon, *City to Pay $3.5 Million to Wrongfully Imprisoned Queens Man*, N.Y. TIMES, Oct. 17, 2008, at A21.  This may be considered regarding the plausibility of Plaintiff's present claims.

counsel should have "suspected that additional impeaching evidence was being withheld"). Defense counsel here was not required to assume that Blanchard had knowingly elicited false testimony, while suppressing *Brady* material.  Indeed, Blanchard falsely represented that Sara's initial testimony had resulted from a misunderstanding of the question and had Sara correct it. Defense counsel was not required to intuit that Blanchard was deliberately deceiving him, the court, and the jury.  Moreover, there is no reason to believe that, if counsel had asked dangerous, open-ended questions about what had occurred during the meeting, Sara, who was testifying against the defense in a seemingly hostile manner, would have revealed the truth.  A trial is not a game of roulette.  The prosecutor is required to reveal exculpatory information so that the defense can make effective use of it; she may not force defense counsel to bet the house by asking risky questions in the dark and potentially garnering sympathy for a seemingly harassed witness.  *See Jenkins v. Artuz*, 294 F.3d at 296 (refusing to fault defense counsel, under *Brady*, for failing to ask more probing questions regarding a key witness's plea deal, as "[f]urther questioning by defense counsel could have prejudiced [the petitioner]"); *Leka*, 257 F.3d at 103 (where prosecutor disclosed the identity of an exculpatory witness on the eve of trial and declined to call the witness in her direct case, defense counsel could not be faulted for failing to seek a continuance "to call [the] witness cold, which would [have been] suicidal").

**B.      This Court Is Bound To Follow Second Circuit Case Law Holding That A Municipality May Be Held Liable For A County District Attorney's Managerial Policies, Including A Personnel Policy Of Indifference To Prosecutorial Misconduct**

As the City acknowledges, in *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992), the Second Circuit squarely held that New York City may be held liable under *Monell* for a county district attorney's deliberately indifferent training or supervisory policies which lead to violations of *Brady* or other constitutional obligations.  The Court held that office-wide training

19

and supervision are management functions that are conducted on behalf of the county or city,
even though, as the Court previously had held in *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir.
1988), a district attorney acts on behalf of the State when he makes prosecutorial decisions in
individual criminal cases. It reasoned that county district attorneys within New York City "have
final, discretionary authority to implement training and supervision within their own office.
Since the City has conceded that no City official has veto authority over training and supervisory
decisions by the county District Attorney, we hold that the Kings County District Attorney acted
as a municipal policymaker in this case." *Walker*, 974 F.2d at 301.

     *Walker* is consistent with numerous other Second Circuit decisions upholding municipal
or county liability for a D.A.'s overall management policies even when the constitutional injury
they cause occurs during a criminal prosecution. *See Myers v. County of Orange*, 157 F.3d 66,
76-77 (2d Cir. 1998) (county liable for district attorney's unconstitutional cross-complaint
prosecutorial policy); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1153 & n.14 (2d Cir. 1995)
(county liable for a malicious prosecution caused by the D.A.'s managerial policy); *Gan v. City
of New York*, 996 F.2d 522, 525-26 (2d Cir. 1993) (New York City liable for the New York
County D.A.'s management policies regarding protection of criminal complainants); *Gentile v.
County of Suffolk*, 926 F.2d 142, 152 n.5 (2d Cir. 1991) (county liable for district attorney's
indifference to misconduct by prosecutors and police, "which gave rise to the individual
defendants' conduct in promoting the malicious prosecution of plaintiffs"). *See also Frank v.
Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) (municipality liable for a D.A.'s management decision
to force the resignation of an employee who had questioned the office's *Brady* disclosure
policy). Numerous other circuit courts similarly have held, under the laws of the state in
question, that a county or municipality may be held liable for constitutional torts caused by a

local district attorney's administrative policies.  *See, e.g., Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) (California); *Botello v. Gammick*, 413 F.3d 971, 978-79 (9th Cir. 2005) (Nevada); *Carter v. City of Philadelphia*, 181 F.3d 339, 352 (3d Cir. 1999) (Pennsylvania); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (Louisiana); *Crane v. State of Texas*, 766 F.2d 193 (5th Cir. 1985) (Texas).

Whether an official's function is classified as state or local in nature is controlled by the Supreme Court's decision in *McMillian v. Monroe County*, 520 U.S. 781 (1997), which involved the law enforcement policies of an Alabama sheriff.  Chief Justice Rehnquist's majority opinion held that the Court's inquiry was "dependent on an analysis of state law," although it noted that a state could not *evade* county liability by "simply labeling as a state official an official who clearly makes county policy." *Id*. at 786.  "Critical[]" to the Court's analysis in that case, Chief Justice Rehnquist wrote, was the Alabama's Supreme Court conclusion that, under Alabama law, the sheriff exercised law enforcement functions on behalf of the State. *Id*. at 789.

Following *McMillian*, the Second Circuit, after conducting an exhaustive analysis of New York State law, explicitly reaffirmed its holding in *Walker* that a district attorney's "decision not to supervise or train ADAs on *Brady* and perjury issues ... would result in county liability." *Myers v. County of Orange,* 157 F.3d at 76-77.  *Myers* was followed by two New York State appellate decisions, *Ramos v. City of New York*, 285 A.D.2d 284, 303 (1st Dept. 2001), and *Johnson v. Kings County Dist. Attorney's Off.*, 308 A.D.2d 278, 295-96 (2d Dept. 2003), which agreed with the Second Circuit's view.  Indeed, *Ramos*, like Darren Felix's case, involved a *Monell* claim against the City for the deliberate indifference of the same D.A.'s Office (the Bronx), under the same theory (failure to discipline), causing the same constitutional violations (*Brady* and summation misconduct).  *See also Drakeford v. City of New York*, 6

21

A.D.3d 302, 303 (1st Dept. 2004) ("Legal claims against the Kings County District Attorney for tortious conduct are properly lodged against the City of New York."); *Whitmore v. State*, 55 A.D.2d 745 (3d Dept. 1976) (county's liability for a District Attorney's torts is "so well-established that no discussion is necessary").  Under the federalist principles underlying *McMillian*, the state courts' view of state law is virtually dispositive.

The City's argument that the Second Circuit's *Walker* rule has been "overruled" by *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), is plainly wrong.  *Van de Kamp* holds that absolute immunity absolves a district attorney from *personal* liability for even administrative policymaking (failing to adopt adequate procedures for keeping records of the cooperation history of prosecution witnesses) where it directly relates to how individual criminal prosecutions are handled.  The Court expressed concern that individual prosecutors might be inhibited from properly carrying out their duties if they had to be concerned about being sued in their personal capacities.  555 U.S. at 346-48.

However, the liability of a *municipality* for a district attorney's managerial or administrative functions presents a very different question under *McMillian*: whether the function in question, under the particular state's laws, is a municipal or a state one.  Accordingly, in a subsequent decision in the very same lawsuit, the Ninth Circuit held that, even though the district attorney had absolute immunity, the municipality he represented could be held liable under *Monell* for the very same administrative policies.  *See Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013), *cert. denied sub nom. County of Los Angeles v. Goldstein*, – S. Ct. –, 2014 WL 102431 (Jan. 13, 2014).  In rejecting the very argument Defendant makes here – that *Van de Kamp*'s absolute immunity rule also precludes *Monell* claims – the Ninth Circuit pointed out that *Van de Kamp* is based upon the "policy considerations which compel civil immunity,"

22

*id.*, quoting *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) – "a federal question that will have a consistent answer nationwide" – whereas the *Monell* question is controlled by a state-by-state analysis under *McMillian*, 750 F.3d at 760.  It reasoned:  "The conduct at issue here does not involve prosecutorial strategy, but rather administrative oversight of systems used to help prosecutors comply with their constitutional duties."  *Id.* at 762.  Other courts also have concluded that *Van de Kamp* has no impact on the application of *McMillian* to *Monell* claims.  *See Jovanovic v. City of New York*, 2010 WL 8500283, at *16 n.12 (S.D.N.Y. Sept. 28, 2010) (Crotty, D.J.); *Johnson v. Louisiana*, 2010 WL 996475, *11-13 (W.D. La. Mar. 16, 2010).

The simple answer to the City's present argument conflating personal immunity and municipal liability is that, unlike individuals, "municipalities do not enjoy immunity from suit – either absolute or qualified – under § 1983." *Leatherman v. Tarrant Co. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993); *see also Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980).  Exempting not only individual officials, but municipal governments too, from liability for governmental violations of federal constitutional rights would defeat the purpose of the Civil Rights Act to provide redress to individuals "wronged by the misuse of power." *Johnson v. Louisiana*, 2010 WL 996475, at *12 (quoting *Owen v. City of Independence*, 445 U.S. at 650).  As Justice Brennan explained in *Owen*:  "A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed."  445 U.S. at 651.  The policy interests underlying personal immunity for public officials, Justice Brennan reasoned, "are less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue."  *Id.* at 653.  Such officials *should* be concerned that their policies

23

deplete municipal funds:

> [C]onsideration of the municipality's liability for constitutional
> violations is quite properly the concern of its elected or appointed
> officials. Indeed, a decisionmaker would be derelict in his duties if,
> at some point, he did not consider whether his decision comports
> with constitutional mandates and did not weigh the risk that a
> violation might result in an award of damages from the public
> treasury.

*Id.* at 655-56 (footnotes omitted).

The City's argument that New York City may not be held liable for the managerial or personnel policies of a county district attorney because the district attorney is independent of other city officials turns *Monell* on its head. As *Walker* held, 974 F.2d at 296, under *Monell* and its progeny, it is precisely for this reason that New York City is liable for a county district attorney's managerial policies: The district attorney is the final policymaker for the municipality that employs him and the local taxpayers who elect him, and thus it is appropriate to focus on *his* policies in determining whether the municipality should be held responsible to compensate the injured individual with monetary damages. *See, e.g., City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1998); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484-85 (1986) (plurality opinion). Indeed, in *Jeffes v. Barnes*, 208 F.3d 49, 60-61 (2d Cir. 2000), the Second Circuit held that a county may be held liable for the personnel management decisions of a sheriff precisely because the sheriff was an independently elected official (like a district attorney) who did not "answer" to the county manager or "any other entity in the management of his jail staff" and thus was the municipality's final policymaker. *Id.* For the same reason, New York City is not relieved of liability for the unlawful administrative or personnel policies of a district attorney simply because the district attorney, like a sheriff, is an independent constitutional officer who need not

24

answer to any other New York City official; to the contrary, it is for precisely this reason that the City *is* liable for the district attorney's constitutional torts. "After all, it is the public at large which enjoys the benefits of the government's activities, and it is the public at large which is ultimately responsible for its administration. ... [I]t is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights ... have been violated." *Owen v. City of Independence*, 445 U.S. at 655. Any other rule would mean that no government entity has responsibility for a District Attorney's policies, no matter what constitutional harm they cause, which would defeat Congress's purpose in enacting § 1983.

The City relies on *dictum* in *Jones v. City of New York*, 12 CV 1730 (JBW), 2013 WL 6814796 (E.D.N.Y. Dec. 20, 2013) (Weinstein, Senior D.J.), to urge this Court to decline to follow the *Walker* rule. *Jones* involved a claim of municipal liability based upon inadequate training of Brooklyn ADAs concerning their obligation to make immediate, pretrial disclosure of exculpatory DNA evidence to avoid unjustified pretrial incarceration. The court dismissed this claim on multiple factual grounds, and thus its consideration of the legal issue of whether there might be municipal liability was *dictum*. Nevertheless, it reasoned that *Van de Kamp* somehow overrules *Walker* and that the City may not be held liable for the policies of a D.A. because other City officials cannot control the D.A. This reasoning is wrong.

First, *Jones* fails to consider that the Court in *Van de Kamp* was concerned only with the issue of personal absolute immunity, and nowhere considered the distinct issue of municipal liability. A district court may not disregard Circuit Court precedent based upon language in a Supreme Court decision that concerns a distinct legal question and does not "inevitably" require the Second Circuit to overrule its own precedent. *See United States v. Emmenegger*, 329

25

F.Supp.2d 416, 429 (S.D.N.Y. 2004) (Lynch, D.J.).  Second, *Jones* ignores the Supreme Court's

controlling decision in *McMillian*, as well as the state appellate decisions (*Ramos* and *Johnson*),

construing state law, to which, under *McMillian*, federal courts should defer.  Third, *Jones* fails

to consider the Supreme Court's holding in *Leatherman* and *Owen* that individual immunities do

not apply to municipalities under § 1983 and that the policy considerations are very different.

Fourth, *Jones* overlooks Supreme Court and Second Circuit case law holding that a municipality

may be held liable for constitutional violations caused by the policies of an independent

municipal official regardless of whether (indeed, precisely because) that official is independent

of other city officials and therefore is the city's final policymaker.[7]

**C.**     **The Complaint States A Plausible Claim That The Bronx District Attorney's Deliberate Indifference To *Brady* Violations And Related Summation Misconduct Was A Substantial Cause Of Plaintiff's Constitutional Injuries**

The City argues that the Complaint does not state even a *plausible* claim for *Monell*

liability based upon the Bronx D.A.'s history of deliberate indifference to *Brady* violations and

summation misconduct.  Its argument overlooks or misconstrues the applicable law and facts.

The Complaint alleges that the City of New York is liable under *Monell* for the violation

of Plaintiff's constitutional rights at trial, specifically, the prosecutor's knowing reliance on false

---

[7]Moreover, *Jones*, besides being *dictum*, and besides being contrary to binding Circuit Court precedent that has not been overruled, is distinguishable from this case.  *Jones* reasons that an unlawful *training* claim is functionally indistinguishable from a claim involving prosecutorial policy, which *Jones* assumes would involve a state function, *but see Myers v. County of Orange, supra*, since training in a rule of criminal procedure is equivalent to the promulgation of a policy.  However, the function of disciplining (or failing to discipline) an employee is not the equivalent of announcing a substantive policy, but involves the consequence (or lack of consequence) for *violating* a substantive policy. Discipline is a quintessential administrative or personnel function, performed by a District Attorney in his role as manager of his municipal agency, which at most has an indirect effect on the conduct of ADAs in the courtroom, in contrast to training about substantive prosecutorial policy, which is intended to and does have a direct effect.  *Compare Van De Kamp*, 555 U.S. at 344 (noting that training and supervision is "directly connected with the conduct of a trial" and distinguishing other administrative functions such as "workplace hiring").

testimony and argument and failure to correct the same, and the prosecutor's failure to disclose *Brady* information. Cpt., ¶ 74(a). These violations resulted from the prosecutor's knowledge of "[t]he District Attorney's deliberate indifference to violations by his subordinates of his Office's Constitutional obligations [which] foreseeably encouraged such violations to occur and was a substantial cause of the violations of Plaintiff's constitutional rights ... ." Cpt., ¶ 85.

The City's reliance on *Connick v. Thompson*, 131 S. Ct. 1350 (2011), is completely misplaced. In that case, a narrow 5-4 majority reversed a judgment for the plaintiff in a *Monell* claim, *after a full trial*, based upon a county D.A.'s failure to *train* ADAs in their *Brady* obligations. The Court relied on the absence of *any* evidence in the trial record of even one prior similar incident to provide notice to the District Attorney that existing training *in that area* was inadequate. The only bearing that *Connick* has on this case, at least at this juncture, is that it requires, in an unlawful *training* case, a showing of an unspecified number of prior similar incidents providing notice of a need for better training. Thus, if Plaintiff's claim was inadequate *training*, his Complaint arguably would have to allege at least a few prior similar incidents of misconduct, which the District Attorney unreasonably ignored in failing to provide better training in the same general area of practice, in order to provide the court with a basis to conclude that his overall theory of recovery is plausible.

While the Complaint more than does so, Plaintiff's principal claim is not inadequate *training* in a particular area of practice, but that the district attorney was indifferent to *violations* of training and constitutional requirements – essentially, a policy of condonation. This is a well-established theory of *Monell* liability in the Second Circuit (and elsewhere). *See, e.g., Vann v. City of New York*, 72 F.3d 1040, 1049-51 (2d Cir. 1995) (misconduct complaints "followed by no meaningful attempt on the part of the municipality to investigate or to forestall further

27

incidents" sufficient to establish liability); *Walker v. City of New York*, 974 F.2d at 300

(upholding lawsuit on theory of "a practice of condoning perjury (evidence perhaps by a failure

to discipline for perjury)"); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d at 123 ("municipality had

notice of but repeatedly failed to make any meaningful investigation into charges that police

officers ... [acted] in violation of the complainants' civil rights"); *Gentile v. County of Suffolk*,

926 F.2d at 153 (authorities "consistently ignore[d] evidence of misconduct"); *Fiacco v. City of

Rensselaer*, 783 F.2d 319, 330-32 (2d Cir. 1986) (history of "uninterested and superficial"

responses to complaints "would have been viewed by the officers ... as reflecting an

indifference"). *See also Vineyard v. County of Murray, Georgia*, 990 F.2d 1207, 1212 (11th Cir.

1993) (basing liability on "inadequate procedures for recording and following up complaints ...

[and] no policies and procedures manual," even though there had been no prior similar incidents

of misconduct); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 566 (1st Cir. 1989) (deficient

disciplinary system "made it highly likely that the police officers ... would engage in

[unconstitutional] conduct"). It is a theory that is analytically distinct from a claim of unlawful

or inadequate training. *See, e.g., Amnesty America v. Town of West Hartford*, 361 F.3d 113,

127-32 (2d Cir. 2011) (Sotomayor, C.J.) (differentiating between proof standards and, on that

basis, dismissing an inadequate police training claim while upholding a claim for inadequate

supervision). *See also Connick v. Thompson*, 131 S. Ct. at 1359 (noting that the highest

culpability standard under *Monell* applies to a failure-to-train claim).

    In support of Plaintiff's specific theory of recovery, the Complaint alleges that in at least

56 known instances, courts found that Bronx prosecutors had wrongfully withheld material

evidence, or given false or misleading summations, and *none* of the ADAs involved were

disciplined. Complaint, ¶¶ 76(a) and 77 and Ex. B (listing cases). It alleges further that District

Attorney Johnson revealed his indifference to *Brady* violations by hiring, and making his

director of training, an infamous ADA from Queens County who had been excoriated *by name* in

decisions by the trial court, the Appellate Division, and the Court of Appeals for orchestrating a

deliberate scheme to conceal essential *Brady* material in a murder case.  *See* Cpt., ¶ 78 (quoting

trial judge's "disgust" at the ADA's "charade").  It alleges further that the Bronx D.A. was put

on notice of a need for discipline by disclosures in the *Ramos* civil rights lawsuit, followed by a

$5 million settlement, and by articles in The New York Times, highlighting the Bronx D.A.'s

failure to impose discipline in 72 cases of misconduct, yet continued to fail to discipline such

violations even though courts continued to find them.  Cpt., ¶¶ 79-83.  Finally, Plaintiff alleges:

> Prior to, and following, the *Ramos* settlement, the Bronx District
> [Attorney] had no employee handbook, manual, or other document
> setting forth any disciplinary process for the aforementioned types
> of prosecutorial misconduct, or potential sanctions for them, nor
> was any such process made known to employees in some other
> manner as a deterrent to such misconduct.  The knowledge that
> there would be no personal consequence for violations of the due
> process and fair trial rights of criminal defendants, even after all
> the publicity surrounding the *Ramos* settlement, encouraged
> prosecutors, including Plaintiff's prosecutor, to believe that such
> violations would go unpunished.

Cpt., ¶ 84 (citing Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors will be*

*Disciplined by their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*,

80 FORDHAM L. REV. 537 (2011)).  That article, attached in relevant part hereto as Ex. 6 and

incorporated by reference, summarizes evidence obtained in civil discovery, including the

depositions of District Attorney Johnson and his executive staff, which establish that Johnson,

from 1989 through 2006, had no formal disciplinary standards or procedures and did not

meaningfully discipline a single prosecutor despite scores of court decisions finding often

29

serious and intentional misconduct. *Id*. at 555-558.

In response to this overwhelming showing of plausibility, the City distorts Plaintiff's *Brady* claim and along with it Plaintiff's *Monell* theory. The City redefines Plaintiff's *Brady* claim as "an alleged failure by an ADA to disclose witness statements *that the witness herself effectively disclosed on the stand minutes later and where defense counsel had a full opportunity to explore her testimony, its inconsistencies and the circumstances surrounding it.*" Defts. Mem. 25 (emphasis added). It concludes that Plaintiff's *Monell* claim must fail because he cannot show a history of prior similar cases to establish an unlawful policy of deliberate indifference. This is unsurprising, since the City has reconstituted Plaintiff's claim in a way that makes out *no Brady violation*. Essentially, Defendant's point is that Plaintiff loses because he cannot show a history of courts reversing convictions under *Brady* where there were no *Brady* violations! Of course, as we have shown, Sara Torres did not "effectively disclose[]" the favorable evidence that the prosecution withheld, nor did defense counsel have a "full opportunity" to show the prosecutor's deceit. *See* pp. 18-19, *supra*. For purposes of this motion, the Court must assume the truthfulness of Plaintiff's factual allegations and all reasonable inferences therefrom.

Defendant City engages in an extraordinarily nitpicking dissection of the 56 cases Plaintiff has cited where no discipline occurred. It argues that the only relevant cases are the 38 that were decided after Mr. Johnson became District Attorney in 1989. However, the purpose of listing pre-Johnson cases is to show that Mr. Johnson was on notice, when he took office, of a need for a disciplinary system for his Office and for discipline in individual cases – notice that was repeated time after time, during his tenure, as additional convictions were reversed. Regardless of whether  the pre-1989 cases ultimately will be admitted at trial, they contribute to the plausibility of Plaintiff's overall claim that the Bronx D.A. has been on notice of, yet has

30

remained deliberately indifferent to, a pattern of misconduct by prosecutors in his office.  *See,*

*e.g., Ricciuti*, 941 F.2d 119 at 123-24 (for purposes of a Rule 12(b)(6) motion, the court may

consider allegations in the complaint that might not be admissible at trial).

Next, the City complains that Plaintiff's list of cases include decisions involving

misconduct other than disclosure violations.  Defts. Mem. 21-22.  However, the City overlooks

the allegation in the complaint that ADA Blanchard engaged in other misconduct that violated

Plaintiff's right to a fair trial, specifically by making false, misleading, or other improper

argument in her summation, such as vouching for the truthfulness of a witness she knew had

given untrue testimony.  More than half of the listed cases involve such summation misconduct,

with most of them involving, as in this case, making misleading or false arguments, vouching, or

impermissibly distracting the jury from the real issues.  They are certainly relevant, yet the City

attempts to write them out of the case.

Of the 20 *disclosure violation* cases that were decided after Mr. Johnson took office

(plus five which were pre-Johnson), Defendant maintains that three are irrelevant because they

were decided after Mr. Felix was tried in 2004.  Defts. Mem. 22-23 & nn. 9-10.  However, post-

incident violations *are* relevant, not to demonstrate notice, but to "shed some light on what

policies existed in the city on the date of an alleged deprivation of constitutional right."

*Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989); *see Grandstaff v. City of Borger*,

767 F.2d 161, 171 (5th Cir. 1985).  *See also Gentile v. County of Suffolk*, 926 F.2d at 151 (post-

incident ratification permits inference that unlawful policy existed at the time of the violation of

the plaintiff's rights); *Henry v. County of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997), *amended*,

137 F.3d 1372 (1998) ("failure even after being sued to correct a blatantly unconstitutional

course of [conduct]..." is evidence of the prior policy); *Collins v. City of New York*, 923

31

F.Supp.2d 462, 477 (E.D.N.Y. 2013) (upholding the use of "after-the-fact events" to prove "a prior policy of acquiescence").

Of the 17 cases that, in Defendant's erroneous view, remain, Defendant argues that just eight involved the same disclosure violation that occurred here: the failure to disclose "prior witness statements." Defts. Mem. 23. Defendant cites *Connick v. Thompson*, which held that, in an unlawful training case, prior cases have to involve a similar category of violation to provide reasonably specific notice of a training deficiency. 131 S. Ct. at 1360. However, *Connick* does not apply because this is a failure-to-discipline, not a failure-to-train, case. Plaintiff's theory is that the absence of any disciplinary policy or history for prosecutorial misconduct *of any kind* established an atmosphere where ADAs knew they could do virtually anything in pursuit of convictions, including violate *Brady* and engage in misconduct in summation, without personal consequence. Plaintiff does not contend that the D.A. had a policy of indifference only to specific types of *Brady* violations, or to specific types of summation violations, but to *Brady* and summation misconduct generally. There was no formal disciplinary standards, procedure, or history for *any* violations, of *any* kind.

Even if *Connick* does apply, it does not define the level of similarity nearly as narrowly as Defendant suggests. *Connick* involved the withholding of the results of blood-evidence testing, but the Court did not require that prior cases also involve such results, just the withholding of "physical or scientific evidence of *any kind*." 131 S. Ct. at 1360 (emphasis added). Other cases also define "similarity" by general categories.[8] Here, Defendant narrowly

---

[8] *See, e.g., Cash v. County of Erie*, 654 F.3d 324, 329 (2d Cir. 2011) (relying, in a prison sexual assault case, on prior incident of *invited sexual contact* between a prisoner and guards to "support[] a jury inference that defendants were not committed ... to protect prisoners from sexual exploitation"); *Vann v. City of New York*, 72 F.3d at 1050 (upholding reliance, in a police brutality case, on "evidence of the

defines Plaintiff's *Brady* claim as involving only the failure to disclose a prior inconsistent statement by the same witness.  However, Plaintiff's claim is broader.  The evidence the prosecutor withheld did include a prior inconsistent statement.  However, it also included (1) evidence suggestive of innocence (Plaintiff was not the shooter), (2) impeachment evidence (prior statements undercutting the credibility of Sara's trial testimony), (3) evidence bearing upon the reliability of identification testimony, (4) evidence bearing upon motive to lie (the ADA's coercive comments which intimidated Sara into changing her testimony), and (5) evidence that would correct false or misleading testimony or summation argument.  *All* of the disclosure violation cases identified by Defendant fall into one or more of these categories, and so do most of the summation cases.

In any event, *Connick* does not hold that any particular minimum of other similar misconduct cases is required to prove liability at trial, let alone to make out a "plausible" claim sufficient to survive a pre-discovery motion to dismiss.  In fact, courts in this Circuit have not required more than one or a handful of such cases, particularly where any of the prior cases were egregious.  *See, e.g., Cash v. County of Erie*, 654 F.3d at 339 (one incident where the risk of injury was inherently obvious); *Amnesty America*, 361 F.3d at 129 (single "egregious" incident); *Disorbo v. Hoy*, 74 Fed. Appx. 101, 104 (2d Cir. 2003) (*one* prior incident); *Fiacco*, 783 F.2d at 329-32 (five incidents in a two-year period); *Babi-Ali v. City of New York*, 979 F.Supp. 268, 274 (S.D.N.Y. 1997) (Batts, J.) (nine *Brady* violations over many years).

Here, quite a few of the prior *Brady* cases were egregious, as the decisions listed in the

---

Department's general methods of dealing with *problem policemen* ...") (emphasis added); *Gentile v. County of Suffolk*, 926 F.2d at 146 (plaintiff properly relied, in police brutality case, on "employee misconduct ... in *several different areas of criminal law*") (emphasis added).

Complaint, Ex. B, Case Nos. 12, 16, 18, 20, 21, 29, 32, 34, 35, 36, 39, 42, 45, 46, 49, 53 and 55,

show.  In *People v. Ramos*, 201 A.D.2d 78 (1st Dept. 1994), the prosecutor failed to disclose,

among other things, the alleged child sexual abuse complainant's prior statement that nothing

had occurred, as well as statements by the child and other witnesses that completely undercut the

reliability of her identification of the defendant.  The Appellate Division wrote a blistering

opinion condemning the misconduct.  It also did so in *People v. Lantigua*, 228 A.D.2d 213 (1st

Dept. 1996), a case involving the withholding of information that would have significantly

impeached the credibility of the main eyewitness's identification testimony.  Both these cases

resulted in seven-figure civil settlements against the City for the prosecutorial misconduct, yet

no prosecutor was even investigated, let alone disciplined.  *See* Benjamin Weiser and Andrea

Elliott, *Wrongfully Convicted Man Wins $1 Million Settlement*, N.Y. TIMES, Feb. 5, 2005;

Andrea Elliot and Benjamin Weiser, *When Prosecutors Err, Others Pay the Price*, N.Y. TIMES,

March 21, 2004.  The extraordinary federal remedy of habeas corpus relief was granted in two

egregious cases, *see Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002); *Morales v. Portuondo*, 165

F.Supp.2d 601 (S.D.N.Y. 2001), including, in the former case, an outright dismissal without

retrial after the District Attorney's intransigence in the case was criticized by Judge Chin.

Indeed, in *Ramos*, too, the court held that the District Attorney's refusal to acknowledge

misconduct was evidence of ratification of the *Brady* violations and summation misconduct.  285

A.D.2d at 305-06.  Many of the summation misconduct cases were egregious as well, involving

misleading or inflaming the jury, or vouching, both before, Case Nos.  3, 4, 6, 7, 8, 9, 10, 11, 13,

14, 17, and after, Case Nos. 22, 24, 25, 26, 27, 28, 30, 33, 37, 38, 44, Mr. Johnson took office.

### POINT II

### THE COMPLAINT PLAUSIBLY ALLEGES A *BRADY* VIOLATION BY DET. MORALES; QUALIFIED IMMUNITY DOES NOT APPLY

**A.**　　**The *Brady* Violation**

Defendant Morales argues that he did not commit a *Brady* violation because Sara Torres'

initial statement that Darren Felix's photograph, displayed in an array, "looks like" the shooter,

"is simply not an exculpatory statement *in isolation*." Defts. Mem. 28 (emphasis added). This is

a novel standard. Defendants cite no case remotely suggesting that evidence must be evaluated

"in isolation" in determining whether it is favorable to the defense under *Brady*. Obviously,

evidence must be evaluated in context to determine whether it is favorable to the defense and

material. Here, the evidence in question, in the context of Sara Torres' purported positive

identification and her likely and *actual* trial testimony, unquestionably was favorable to the

defense, and any reasonable police officer would have known it had to be disclosed and that, in

the absence of disclosure, a report making it appear that her identification had been certain all

along was materially misleading.

As a first principle, it is well established that a police officer may be held personally

liable under § 1983 for withholding *Brady* material from the prosecution and thereby preventing

the defense from learning about it. *See Poventud v. City of New York*, 2014 WL 182313, at *8

n.12; *Walker v. City of New York*, 974 F.2d at 300. The defendants do not dispute this.

Second, context is everything under *Brady*: "[T]he omission must be evaluated in the

context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). "[I]f the verdict

is already of questionable validity, additional evidence of relatively minor importance might be

sufficient to create a reasonable doubt." *Id.* at 113. Viewed in isolation, a witness's statement

that it was sunny and dry at the time of the crime may appear innocuous and meaningless, but if the investigation concerns a claim of reckless driving on icy roads during an intense blizzard, then the statement obviously is exculpatory. Whether a statement is impeaching cannot be evaluated except by considering the witness's other statements and his actual or likely testimony. As for materiality, if ten witnesses have identified a suspect, who admits he was present and the only issue is self-defense, then a single eyewitness's initial failure to make an identification may be inconsequential. However, if the whole case turns on identification, and the witness who made the initial statement is the most important identification witness, the *Brady* analysis comes out completely differently.

Third, the defense is entitled under *Brady* to disclosure of evidence that police acted negligently or in bad faith and to discredit the "integrity of the investigation." *Kyles v. Whitley*, 514 U.S. at 446-47.

Here, the sole issue all along was identification, and Morales knew that Sara was the most important identification witness. She was the only eyewitness who *knew* the shooter; she was the only eyewitness who had a long, unobstructed, and stress-free opportunity to observe him. She was the only eyewitness who was shown an array, with similar-looking fillers, as opposed to being shown the suspect under extraordinarily suggestive circumstances (the hospital and street show-ups). Context under *Brady* is everything, and here, where the detective knew that his report, and Sara's likely testimony, was that she had positively identified Felix, the fact that at first she did not do so, but said only that he "looked like" the guy, was impeaching. It should have been obvious to any reasonable police detective that the statement had to be recorded, as per NYPD rules and policy, and disclosed.

*Boyette v. Lefevre* is exactly on point. There, the Second Circuit granted habeas relief

36

because the victim's undisclosed initial statement that defendant "may have been" one of her attackers, which impeached later statements that she was "certain" defendant was an attacker, was "classic *Brady* material." 246 F.3d at 91. *See Mayes v. City of Hammond*, 442 F.Supp.2d 587, 631 (N.D. Ind. 2006) (failure to disclose that an identification was at first "tentative" is a *Brady* violation and subjects the offending police official to personal liability under § 1983). *See also Goudy v. Basinger*, 604 F.3d at 399 (statements that impeached eyewitnesses' identifications of defendant as shooter *Brady* material); *Leka*, 257 F.3d 89 (evidence that would have "cast doubt" on a key eyewitness's identification of defendant falls under *Brady*).

Whatever Morales' initial *Brady* obligation, he certainly was required to disclose Sara's initial statement when he was called to testify at the pretrial hearing, and at trial, concerning her level of certainty and reliability. At these times, he *knew* that the circumstances of her identification were in actual issue, and that not only her, but his, testimony would be relied upon by the court and by the jury as a basis for convicting the defendant on trial. At this point, it was unconscionable that he would continue to withhold her initial statement, with the outcome of the trial potentially hanging in the balance, yet that is what he did.

This is not simply a case, as Defendants make it appear, of a detective making at most a good-faith mistake in failing to record information that he had no reason to believe would later prove significant. Crediting the facts alleged in the Complaint and giving Plaintiff the benefit of all reasonable inferences from such facts, it must be inferred that Morales knew the information was *potentially* significant when he prepared his report, and later that he knew it was *actually* significant when he testified misleadingly at the hearing and at trial.

Morales cannot reasonably deny that he knew the Torres statement had to be recorded, or at least disclosed to the defense, when he knew, as the Complaint alleges, ¶ 27,  that recording

37

and disclosure was *required* by his training and by NYPD policy. If such statements were not *always* relevant in determining the witness's certainty and reliability, then NYPD policy would not have been to *always* record them. It may be inferred that Morales violated this policy and his training precisely because he knew how significant Sara's initial statement was and did not want the defense to know about it for fear of sabotaging the case. Thus, the *Brady* violation here concerned not just Sara's credibility and the reliability of her identification, but also the integrity of the overall investigation, which Morales had headed.

Finally, Defendants are wrong that Morales's statements to Torres – "are you sure" and telling her she had picked out the actual police suspect – need not also have been disclosed under *Brady*. By asking her if she was "sure" after she had said only that the photograph "looked like" the shooter, he implicitly encouraged her to say she was more "certain" than she already had indicated she was. The defense was entitled to know this so that it could question the reliability of her subsequent "positive" identification and argue it had resulted from his suggestive question. The defense also was entitled to know that Morales further reinforced the witness's "certainty" by telling her, in effect, that she had picked the "right" guy. Such reinforcing statements are improper because of the risk that they will cause a witness who may have underlying uncertainty to later testify to positiveness in a way that will unduly sway a jury. This type of reinforcing statement is blatantly improper, as all the literature states. *See, e.g.,* Bradfield, *et al.*, *The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy*, 87 J. Applied Psychol. 112 (2002) (recounting a study of 245 participants, which found that confirmatory feedback significantly inflated a witness's certainty about an *inaccurate* identification); Gary L. Wells & Amy L. Bradfield, *Good, You Identified the Suspect: Feedback to Eyewitnesses Distorts Their Reports of the*

38

*Witnessing Experience*, 83 J. Applied Psychol. 360, 374-75 (1998) (noting that post-identification confirmation makes a witness more certain of a false identification and increases the witness's confidence in the strength of their memory of the event). *See also Perry v. New Hampshire*, 132 S. Ct. 716, 737 (2012) (Sotomayor, J., dissenting) ("[J]urors find eyewitness evidence unusually powerful and their ability to assess credibility is hindered by a witness' false confidence in the accuracy of his or her identification.").

Defendants argue (p. 29) that none of this matters because Sara realized at trial that she had picked out the wrong guy and that any *Brady* violation was by the prosecutor who concealed this information. However, Sara's in-court testimony was that she had previously correctly identified the shooter from his photo, regardless of whether she could identify him now. The defense was entitled to impeach this testimony with the information, withheld by Morales, that undermined the reliability of her original photo identification.

Moreover, it may be inferred that if ADA Blanchard had known that Sara initially did not make an identification, but simply said the photo "looked like" the shooter, she would not have assumed that Sara was now merely scared and pressured her to stick to what Blanchard assumed was Sara's original belief that Felix was the shooter. Nor, knowing that initially Sara had made no true identification at all, would she have made the misleading argument that the jury could and should convict based upon Sara's "positive" photo identification. Regardless of whether Blanchard *also* engaged in misconduct, Det. Morales' preparation of a misleading report and his ongoing *Brady* violation was a concurrent cause of conviction; he is not let off the hook merely because of subsequent wrongdoing by still another actor in this unfortunate affair. *See Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) ("Section 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'")

39

(quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)); *Myers v. County of Orange*, 157 F.3d at 74 ("[D]efendants in § 1983 actions may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.") (citation and quotations omitted); *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996) ("Persons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned.") (collecting cases); *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) ("It is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury.") (citing Restatement (Second) of Torts, §§ 875, 879) (§ 1983 case).

Finally, Plaintiff is entitled to pursue alternative theories of liability. Blanchard denies Sara's claim, which is the basis for the Complaint, that Blanchard pressured her after she told Blanchard that Felix was not the shooter. If the jury ultimately were to credit Blanchard's account over Sara's, Plaintiff still would be entitled to recover under his alternative claim that his conviction was proximately caused by the misconduct of Det. Morales.

**B.     Qualified Immunity Does Not Apply**

Without citing a single case finding qualified immunity for a police officer's *Brady* violation, Morales contends he is entitled to qualified immunity because "reasonable officers could disagree as to the legality of his conduct" and whether Torres's statement that Plaintiff's photo merely "looked like" the shooter was "exculpatory." Defts. Mem. 31. However, as we demonstrated in the previous point, the statement, in relation to Morales' representation in his formal report that she had immediately made an unequivocal, positive identification, and in relation to the similar position of the prosecution at trial, was at least impeaching, if not "exculpatory"; certainly, it was "favorable" to the defense within the meaning of *Brady*.

Qualified immunity does not require a prior Supreme Court holding under similar facts, but rather that "the state of the law ... gave respondents fair warning that their [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal citations omitted). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (dictum) (internal citation omitted). *See generally Jones v. Parmley*, 465 F.3d 46, 55-56 (2d Cir. 2006).

The Second Circuit has squarely held that a police officer may not be granted qualified immunity where he "misrepresented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010). *See also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129-30 (2d Cir. 1997) (clearly established that police may not manufacture false or misleading "evidence"). Numerous Circuit Court decisions have similarly rejected qualified immunity defenses in *Brady* cases on the basis that the police officer had fair warning, under the Supreme Court's basic *Brady* case law, that disclosure of the specific exculpatory or impeachment evidence in question was required. *See, e.g., Haley v. City of Boston*, 657 F.3d 39, 49-50 (1st Cir. 2011) (police did not have qualified immunity, even as early as 1972, for deliberately concealing material evidence and for doing so "to grease the skids for false testimony"); *Moldowan v. City of Warren*, 578 F.3d 351, 381-82, 388-89 (6th Cir. 2009) (it was clearly established as early as 1964 that police must disclose evidence where it is "apparent" that it is favorable to the defense under *Brady*; no additional finding of "bad faith" is required) (citing cases); *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (qualified immunity does not apply where the officer acted in bad faith and where no reasonable police officer could have

41

believed he was entitled to "deliberately misrepresent" the facts or to fail to preserve exculpatory information); *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (rejecting that there needs to be a *Brady* case "on point" so long as there is evidence the officer knowingly suppressed information he had "fair warning" was favorable to the defense under *Brady*); *Pierce v. Gilchrist*, 359 F.3d 1279, 1297-98 (10th Cir. 2004) (rejecting that factual distinctions with prior *Brady* rulings supports qualified immunity where the officer had "fair warning").

In connection with this case, the Second Circuit's decision in *Boyette v. Lefevre, supra*, gave far more "fair warning" to Morales than the case law requires. In *Boyette*, the Second Circuit granted habeas relief due to the prosecution's failure to disclose an eyewitness's initial statement of uncertainty about the defendant's identity as the perpetrator, which contradicted her subsequent positive identification and trial testimony. The Second Circuit held that the witness's first statement was "classic *Brady* material," explaining that it "would have been extremely useful impeachment evidence for defense counsel because [it] suggest[ed] [the victim] could not positively identify [the petitioner] immediately." 246 F.3d at 92.

The qualified immunity issue raised in this case was squarely decided, under similar facts, in *Mayes v. City of Hammond*, 442 F.Supp.2d at 630-634. There, the court rejected an absolute immunity defense because it should have been apparent to any reasonable police officer that the "tentative" nature of the victim's initial identification of the criminal defendant contradicted her testimony that she was "positive" and thus should have been disclosed by police under *Brady*. *Id.* at 634. The court relied on evidence in the record that the Chicago Police Department required that, "if the victim expressed uncertainty or indecisiveness in an identification procedure, the detective was required to document and disclose that evidence to the prosecutor... ." *Id.* at 605-06. Even the defendants' police practices expert agreed that "it is

42

important that the person conducting the identification procedure document the procedure including the witness's own words concerning the identification because it is important to see if confidence is increasing over time." *Id.* at 606.

In Plaintiff's case, as he alleges in his Complaint, at the time of his arrest and prosecution, NYPD training and rules required police detectives to fully document how an identification occurred, including all statements to and by the eyewitness reflecting her level of certainty. Giving Plaintiff the benefit of the facts and all reasonable inferences from those facts, it must be concluded, certainly at this stage in the litigation, that no reasonable detective could have believed that he was entitled not to document what happened here – Sara's initial statement of uncertainty and his suggestive questions and comments which may have contributed to her later certainty – and, even worse, not to disclose it to the prosecution.

## CONCLUSION

Defendants' motion to dismiss should be denied, Defendants should be required to answer, and discovery should be permitted.

Respectfully submitted,

JOEL B. RUDIN
Law Offices of Joel B. Rudin
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
E-mail: jbrudin@aol.com

*Attorney for Plaintiff*

Dated: New York, New York
February 10, 2014

43